*Attorney Grievance Commission of Maryland v. Samuel Sperling and Jonathan Daniel Sperling*, Miscellaneous Docket AG Nos. 40 & 76, September Term, 2016

## ATTORNEY DISCIPLINE – SANCTIONS – 90-DAY SUSPENSION

Respondent Samuel Sperling violated the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") in his capacity as an attorney employed by The Sperling Law Firm ("Firm"), a professional corporation owned and controlled by his father, Leonard Sperling.

The Attorney Grievance Commission of Maryland ("AGC") contacted Samuel after the Firm's trust account was overdrawn. At the time, both Leonard and Samuel's brother, Respondent Jonathan Sperling, had been suspended from the practice of law. The AGC reviewed the account information and discovered that Jonathan had been writing checks on the trust account. Upon suspicion that Leonard and Jonathan continued to practice law despite their suspensions, and that all three Sperlings were engaged in misconduct, the AGC sought and received a temporary restraining order prohibiting the Firm from further operation and appointing a temporary receiver. The AGC discovered that Leonard had continued to practice law after his suspension, settled cases, and misappropriated substantial client funds. The trust account had been badly mismanaged, and numerous Firm clients were referred to the Client Protection Fund. Samuel had agreed to supervise Jonathan following his suspension but was apparently unaware of his brother's use of the trust account and, although he placed client funds in the trust account, did not review account statements or reconcile the accounts.

Samuel violated: (1) MLRPC 1.15(a) (Safekeeping Property); MLRPC 5.3(b), (d)(2)(F), and (d)(3) (Responsibilities Regarding Nonlawyer Assistants) as to Jonathan; (3) MLRPC 5.4(d)(1) (Professional Independence of a Lawyer); and MLRPC 8.4(a) (Misconduct) when he failed to safeguard client funds and did not adequately supervise Jonathan's post-suspension conduct. Taken together, Samuel's violations warrant a 90-day suspension from the practice of law.

## ATTORNEY DISCIPLINE – SANCTIONS – INDEFINITE SUSPENSION

Respondent Jonathan Sperling violated the MLRPC in his capacity as a paralegal and suspended lawyer seeking reinstatement. Jonathan was indefinitely suspended from the practice of law in Maryland in 2013. While seeking readmission to the Bar, Jonathan submitted numerous affidavits and statements to the AGC attesting to his compliance with the Rules. Before his suspension, Jonathan represented Luvenia Jeter in a dispute with a local college regarding Jeter's dismissal from a nursing program. Luvenia Jeter complained to the AGC that Jonathan neglected her matter, accepted payment without doing any work on her case, and failed to notify her when he stopped working on the case. When the AGC investigated the matter, it found reason to believe that Jonathan violated the MLRPC. The AGC also concluded that Jonathan made several misrepresentations in

his efforts to gain readmission to the Bar following his suspension in 2013, in violation of the MLRPC.

Jonathan violated: (1) MLRPC 5.3(d)(3) (Responsibilities Regarding Nonlawyer Assistants); (2) MLRPC 8.1(a) (Bar Admission and Disciplinary Matters); and (3) MLRPC 8.4 (a), (c) and (d) (Misconduct) when he failed to comply with his obligations as a suspended lawyer working in a law firm and made misrepresentations during his suspension and in his efforts to gain readmission to the Bar. Taken together, these violations warrant continuing his indefinite suspension.

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG Nos. 40 and 76

September Term, 2016

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

SAMUEL SPERLING and
JONATHAN DANIEL SPERLING

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

Opinion by Adkins, J.
Greene and Watts, JJ., concur and dissent.

Filed:   May 21, 2018

In 2016, the Attorney Grievance Commission of Maryland ("AGC"), acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action ("Petition") against Respondents Samuel Sperling and Jonathan Daniel Sperling.[1] The AGC's investigation began in 2014 after it received notice that The Sperling Law Office, P.C.'s ("Firm") trust account was overdrawn.[2]

Bar Counsel charged Samuel with violating the Maryland Lawyers' Rules of Professional Conduct[3] ("MLRPC") in his capacity as an attorney working at the Sperling Law Office, P.C. ("Firm"). Specifically, Bar Counsel alleged that Samuel violated MLRPC: (1) 1.15(a) and (d) (Safekeeping Property); (2) 5.3(a)–(d) (Responsibilities Regarding Nonlawyer Assistants); (3) 5.4(a) and (d) (Professional Independence of a Lawyer); (4) 5.5(a) (Unauthorized Practice of Law; Multijurisdictional Practice of Law); (5) 8.1(a) and (b) (Bar Admission and Disciplinary Matters); and (6) 8.4(a)–(d) (Misconduct).

Bar Counsel charged Jonathan with violating MLRPC: (1) 1.1 (Competence); (2) 1.2(a) (Scope of Representation and Allocation of Authority Between Client and Lawyer); (3) 1.3 (Diligence); (4) 1.4(a)–(b) (Communication); (5) 1.5(a)–(b) (Fees); (6) 1.16(d)

---

[1] For clarity, the Sperlings will hereinafter be referred to by their first names.

[2] The Attorney Grievance Commission filed a separate Petition for Disciplinary or Remedial Action against Jonathan in 2017, stemming from a complaint filed by Luvenia Jeter, a former client of Jonathan's. By Order of this Court, the matters were consolidated.

[3] Effective July 1, 2016, the MLRPC were renamed the Maryland Attorneys' Rules of Professional Conduct ("MARPC") and renumbered. Rules Order (June 6, 2016). The revised rules are now numbered as follows: MARPC 19-301.1, et. seq. We will refer to the MLRPC because the misconduct at issue occurred before this change.

(Declining or Terminating Representation); (7) 5.3(d)(3) (Responsibilities Regarding Nonlawyer Assistants); (8) 8.1(a)–(b) (Bar Admission and Disciplinary Matters); and (9) 8.4(a)–(d) (Misconduct).

We transmitted the matter to the Honorable H. Patrick Stringer ("the hearing judge") of the Circuit Court for Baltimore County to hear the case. Following a five-day hearing, the hearing judge issued Findings of Fact and Conclusions of Law, in which he found by clear and convincing evidence that Samuel violated MLRPC 1.15, 5.3(b) and (d)(3), 5.4(d)(1), and 8.4(a). The hearing judge also concluded that Jonathan violated MLRPC 5.3(d)(2)(G) and (d)(3), 8.1(a), and 8.4(a) and (c), and Maryland Rules 16-760(c)(11), (d)(3), and 16-609(b).[4]

## THE HEARING JUDGE'S FINDINGS OF FACT

Samuel was admitted to the Maryland Bar in 1996, and Jonathan was admitted in 1998. Upon admission, both brothers began working as associates at a law firm operated as a sole proprietorship by their father, Leonard Sperling ("Leonard"). In March 2004, the Court of Appeals suspended Leonard from the practice of law.[5] During his suspension, The Sperling Law Office, P.C. was formed. The Articles of Incorporation identify Samuel as the incorporator, and Samuel and Jonathan as the initial directors. The hearing judge found that there was no evidence that Samuel and Jonathan remained as directors or served

---

[4] Maryland Rules 16-760 and 16-609 have since been amended and renumbered as Md. Rules 19-742 and 19-410 respectively.

[5] *Attorney Grievance Comm'n v. Sperling*, 380 Md. 180 (2004).

as officers of the Firm beyond the initial formation.  At the same time, the Firm also established an attorney trust account.  Leonard, Samuel, and Jonathan were the only attorneys with signatory authority on the trust account.

Leonard was reinstated in July 2004 and resumed practice at the Firm.  The hearing judge found that Leonard was the sole shareholder, and he ran the firm, including "managing the attorney trust account, assigning cases, settling cases, paying bills[,] and handling the payroll."

In July 2013, Jonathan was indefinitely suspended from the practice of law.[6]  He was represented by Robert Hesselbacher, who continued advising Jonathan after his suspension about compliance with the Rules and reinstatement requirements.[7]  Hesselbacher met with Jonathan, Samuel, and Leonard to discuss the limitations on Jonathan's activities as a suspended attorney.  On July 10, 2013, the Firm employed Jonathan as a paralegal.

In September 2013, Leonard was indefinitely suspended from the practice of law.[8]  His suspension became effective in October 2013.  At that time, there were three licensed attorneys working at the Firm: Samuel, Andrea Babest, and Michele Loewenthal.  Leonard continued to work at the Firm following his suspension.  In April 2014, Jonathan filed a

---

[6] *Attorney Grievance Comm'n v. Sperling*, 432 Md. 471 (2013).

[7] Robert Hesselbacher also represented and advised Leonard regarding compliance with the Rules following Leonard's suspension.

[8] *Attorney Grievance Comm'n v. Sperling*, 434 Md. 658 (2013).

Petition for Reinstatement, which Bar Counsel opposed. The Court of Appeals denied Jonathan's reinstatement in July 2014.

In April and May 2014, Bar Counsel received notices stating that the Firm's trust account was overdrawn. Samuel retained an experienced ethics attorney, Michael McCabe, to assist him in responding to Bar Counsel's inquiries. McCabe advised him to start a new law firm or take over the Firm. On June 6, 2014, Samuel created The Sperling Firm, LLC ("the LLC"), where he currently practices, and is the sole member.

On July 31, 2014, Bar Counsel filed a Complaint for a Temporary Restraining Order, Preliminary, and Permanent Injunction in the Circuit Court for Baltimore County requesting that Leonard and Jonathan no longer be associated with the Firm, prohibiting withdrawals or transfers from the Firm's accounts, and ending operation of the Firm. The Circuit Court issued a Consent Order prohibiting the Firm from operating, and appointing Edward Gilliss, Esq., as interim receiver.

Gilliss's primary duties were to identify active files and ensure that an attorney was available to represent the clients, and to identify closed cases in which clients had not been paid. Gilliss met with Samuel, Leonard, and Jonathan regarding matters at the Firm. Samuel and Jonathan assisted Gilliss—Samuel identified active clients, and Jonathan identified closed matters wherein clients or other expenses had not been paid. Gilliss sent active clients a letter notifying them that they could elect Samuel or Babest to represent them or choose another attorney. Samuel, Babest, and Gilliss agreed to a split of attorneys' fees. Gilliss received 25% of the "legal fee that was generated from resolution of those active files," and successor counsel received 75%.

4

Gilliss discovered that Leonard had misappropriated a significant amount of money from the trust account and settled claims, but had not paid medical expenses, other lien holders, or the clients. With no money available in the trust account to pay these obligations, Gilliss referred clients to the Client Protection Fund.

On August 26, 2014, the Court of Appeals issued an Order disbarring Leonard for multiple violations of the MLRPC, including misappropriation.[9] The hearing judge found that there was no evidence that Samuel or Jonathan misappropriated funds, or that they knew that their father was doing so.

### The Attorney Trust Account

In 2004, the Firm implemented a system that was in effect through July 31, 2014. The Firm kept a register in which entries were made when a check was written. The "date, check amount, activity, reason for the disbursement (whether a settlement or fee) and client's name would be recorded." Samuel entered all the checks he wrote in the register.

After Jonathan and Leonard were suspended, both remained signatories on the trust account, and continued writing checks. Leonard, Jonathan, and Samuel all wrote checks on the account during the relevant period. While Leonard wrote most of the checks, Jonathan wrote 86 checks, either payable to cash, or to the Firm. Jonathan explained that Leonard told him to "write the checks from the escrow account and deposit the money in the operating account as payment of fees earned by the firm." This was to "avoid delay of

---

[9] *Attorney Grievance Comm'n v. Sperling*, 439 Md. 691 (2014).

the transfer of the funds from the attorney trust account to the operating account." Jonathan did not keep any of the money.

Samuel testified that he did not know that Leonard and Jonathan were writing checks until June 2014. Relying on the parties' stipulations, the hearing judge concluded that Samuel's testimony regarding when he had knowledge of Leonard writing checks was not accurate. The records showed that during his suspension, Leonard wrote nine checks payable to Samuel, which were drawn on the escrow account. Samuel stipulated to endorsing three of those checks.

Samuel deposited client funds in the trust account from July 2013 until the TRO was entered. He represented "at least three . . . clients whose cases he settled and deposited their money in the trust account, but the money was not disbursed to the client[]" because it was part of those funds Leonard misappropriated. As a result, Gilliss directed them to the Client Protection Fund.

From July 2013 until May 2014, Samuel did not "review bank records to determine what funds were being deposited or disbursed from the account, . . . perform monthly reconciliations of the trust account," or restrict Leonard or Jonathan's access to the trust account. Samuel did not take any action to remove Leonard or Jonathan as signatories. He told Leonard and Jonathan to consult with Hesselbacher regarding actions they could or could not take as suspended attorneys.

The hearing judge concluded that based on the number of checks that Leonard and Jonathan wrote, "Samuel should have known Jonathan and Leonard were writing checks on the trust account." Even if Samuel did not know who was writing the checks, he "should

6

have known, or at least suspected that Leonard and Jonathan were writing checks on the trust account and inquired where the checks were." After he learned that the trust account was overdrawn, Samuel "finally confronted his father and told him and Jonathan they could not write escrow checks." But Leonard and Jonathan continued writing checks through July 2014.

### Jonathan's 5.3 Agreement

In November 2013, Hesselbacher, acting on Jonathan's behalf, sent Bar Counsel a draft Md. Rule 16-760 affidavit, and a Md. Rule 16-781(d) statement for review. The 16-781(d) statement explained Jonathan's employment status at the Firm, and that Leonard and Samuel had supervised him since his suspension. A few days later, a paralegal with the Office of Bar Counsel notified Hesselbacher that Jonathan had not provided an employment agreement to Bar Counsel. MLRPC 5.3(d)(3) requires a suspended attorney who is employed by a lawyer to file an employment agreement with Bar Counsel within 30 days after the employment begins. Hesselbacher forwarded the e-mail to Jonathan, indicating that he needed a "written agreement with the firm with the terms of [his] employment as a paralegal and complying with that Rule."

In November or December 2013, an employment contract ("5.3 Agreement") dated July 10, 2013 was prepared.[10] Samuel and Jonathan signed it, and Hesselbacher sent it to Bar Counsel on January 13, 2014, along with Jonathan's Rule 16-178(d) statement, Rule 16-781(g) affidavit, and supplemental 16-760 affidavit. The hearing judge concluded that

---

[10] The hearing judge made no finding as to who drafted the agreement, other than finding that Hesselbacher did not draft the agreement.

7

backdating the 5.3 Agreement was not a misrepresentation. Relying on Hesselbacher's testimony, the hearing judge explained that the 5.3 Agreement was dated July 10, 2013 because that was when Jonathan's employment as a paralegal began, and Jonathan's Rule 16-718(d) statement specified that the 5.3 Agreement was "effective July 10, 2013." The hearing judge also considered that the position of the date, at the top of the 5.3 Agreement, was consistent with it being an "effective date," because agreements tend to specify if a date is a signing date or locate the signing date near the signature line. The hearing judge found that Respondents did not intend to mislead Bar Counsel about the date of creation. Had they so intended, they would have included Leonard's name on the letterhead and Leonard, not Samuel, would have signed the agreement.

Bar Counsel had requested that Samuel identify and save all computers Jonathan might have used. Samuel complied, however, in June 2015, the Firm was a victim of a ransomware attack. Samuel contacted David Spiegelman, who performed IT services and restored the firm's files. After the restoration, all documents had the same creation date—June 30, 2015—the day they were restored, and metadata[11] was missing. Bar Counsel alleged that the Respondents attempted to obstruct the investigation by destroying the metadata, specifically claiming that Samuel intentionally "did not ensure that the metadata was preserved when the computer data was restored" to prevent determination of when documents were created.

---

[11] "[M]etadata is 'data about data,' which includes information such as who edited a document . . . ." Paula Schafer, *The Future of Inadvertent Disclosure: The Lingering Need to Revise Professional Conduct Rules*, 69 Md. L. Rev. 195, 208 n.62 (2010).

Spiegelman identified Jonathan's computer and provided it to Phillip Blazer-Catzen, Bar Counsel's forensic computer expert, along with access to the Firm's server. Although Catzen testified that the metadata was not restored because the technician who restored it chose not to do so, he admitted that it is not uncommon to see legal documents without internal metadata, and he did not know if metadata was enabled when the 5.3 Agreement was created.

The hearing judge found that Samuel did not ask Spiegelman to limit the information he restored, delete information, or omit or delete metadata, and that Samuel did not know what metadata was. Further, Spiegelman "did not and could not, change the metadata" because when he restored the backup data, "the operating system [gave] the data a new creation date[,] which is the date of restoration."

The hearing judge also concluded that Bar Counsel failed to prove by clear and convincing evidence that Respondents fabricated a claim of attorney-client privilege to prevent Bar Counsel from determining when the 5.3 Agreement was created. During an e-mail exchange with Bar Counsel in December 2015, Respondents' attorney stated that his only copy of the 5.3 Agreement was an electronic copy that Jonathan had used to communicate with Hesselbacher, and that some edits and metadata might be privileged. The hearing judge determined that although Hesselbacher did not draft the Agreement, it did not mean that "Respondents' counsel did not have a basis to believe the internal data might be privileged."[12] Bar Counsel also acknowledged that Respondents' counsel had

_____

[12] The parties reached an agreement to protect personal client information on the Firm's server so that Catzen could examine the files.

9

provided the date that the 5.3 Agreement was last modified and allowed Catzen to examine the document.

**Law-Related Activities by Suspended Attorneys**

After Jonathan was suspended, Samuel agreed, at Leonard's request, to supervise his brother. Upon Jonathan's suspension, Hesselbacher told him to examine Rule 5.3, and advised Jonathan that he could not perform law-related activities for the firm. Jonathan performed clerical and administrative duties while suspended, but did not meet with clients, take depositions, do legal research, or draft legal documents. On one occasion, with special permission by the presiding judge, Jonathan attended court with Samuel to assist a blind client.

The hearing judge found Babest and Loewenthal to be credible and adopted their testimony about Jonathan's activities as fact.

> **Babest**: I personally observed Jonathan Sperling doing a lot of clerical duties. He made copies if, if the attorneys needed copies of exhibits for cases or hearings, he obtained office supplies, he would pick up the mail at the end of the day if we had a particularly large amount of mail or if there was a heavy package that needed to be weighed at the post office. He picked up our payroll checks, brought them to the office. Whenever any of us had a problem with our computers or the copier of the fax machine, we would ask Jonathan to assist us. He had a knack of making the computers and everything else work or he'd be the point person to contact the repair people to come in.

> \*\*\*\*

> **Loewenthal**: [Jonathan] would help if I had any problems with my computer. He—he helped make copies if I needed them as exhibits for trial. He ran errands. He sometimes answered the phone. . . .

10

Catzen analyzed Jonathan's computer and found 69,000 files on the hard drive of Jonathan's workstation from July 5, 2013 until July 31, 2014. Most of the files were Google Earth files. Catzen found one e-mail from Jonathan to a client ("Hill e-mail") asking the client to call the office to answer interrogatories. Of the 69,000 files, Catzen identified 559 files from the Firm's server that he asserted Jonathan's computer had created, modified, or accessed during that time. Catzen did not analyze the files, and the hearing judge found that of the 559 documents, many of them contained dates of service "well before or after that time frame." Some of the documents were scanned and then converted to word processing documents. Others were created by Loewenthal or Samuel, and some were personal, relating to Jonathan's family and synagogue activities. The hearing judge concluded that this was not clear and convincing evidence that Jonathan's computer was used in law-related activities.

The hearing judge accepted Babest's testimony that Jonathan used Google Earth to find pictures of accident scenes, by finding helpful angles, printing the pictures, and giving them to an attorney in the Firm. He found that this was not law related activity because "[i]t requires no legal knowledge, it is not peculiar to the practice of law, anyone can do it without any legal background . . . ." The hearing judge also found that scanning documents or converting them to word processing documents is not a law related activity because it "is not clear and convincing evidence that Jonathan drafted pleadings, discovery, or correspondence."

11

The hearing judge concluded that the Hill e-mail was a law-related activity, albeit a "gray area," and there was no evidence Jonathan met with the client. It was also determined that making deposits and disbursements from the trust account was not a law-related activity.

**Samuel's Supervisory Responsibilities**

***Leonard***

In 2013, after Leonard's second suspension, he continued working in the Firm, "kept files in his office, negotiated with adjusters and settled cases." He also handled settlement checks, wrote checks on the trust account, and misappropriated funds.

After Leonard's suspension, Babest had a conversation with Samuel about the Firm's future. She was concerned about Leonard's conduct leading to the suspension, as well as the financial viability of the Firm. There had been issues before Leonard's suspension, with paychecks not being available or bouncing and Babest told Samuel he needed to "look into whether the payroll taxes were being paid . . . ." She suggested to Samuel that "he might be facing liability from the IRS if the payroll taxes weren't being paid." Samuel explained that he was not liable because he was not an officer and did not have any official status in the Firm. Babest also testified that she did not know who managed the Firm after Leonard's suspension, but the staff knew how to run the Firm, and that it was a "collaborative effort" by the entire office after the suspensions. She indicated that Samuel's role gradually changed, and he began asking her to bring him checks to sign and inquiring about the status of cases. Babest indicated that at no time did she view Samuel as her supervisor.

12

Loewenthal testified that Samuel took a more active role, delegating responsibility for handling hearings, depositions, and engaging in planning, but that others were also doing more. Hesselbacher testified that he assumed that Samuel would run the Firm, but "only because 'he was Leonard's son' and he was the 'only Sperling' who was admitted to the bar at that time." Hesselbacher admitted that he did not actually know who was running the Firm.

The hearing judge found Babest's account of the transition "entirely credible" and an "accurate recounting of events and Samuel's role in the firm after Leonard's suspension." Samuel did not agree to take control of the Firm. Leonard was the sole shareholder of the Firm and the only individual who received a K-1. Tax forms list Leonard as the sole officer of the Firm. Samuel was an employee of the Firm, not a shareholder or partner, and received a W-2. The hearing judge found that Samuel "never agreed to supervise his father, but he told Leonard that he needed to discuss with his own attorney what he could or could not do and follow the direction of his counsel, Mr. Hesselbacher."

In June 2014, Samuel e-mailed McCabe explaining the circumstances at the Firm. Samuel advised that he had instructed Leonard to stop signing escrow checks, and that settlements needed to be handled by an attorney. Samuel also stated that he had formed a new law firm, The Sperling Firm, LLC. At this time, he began transitioning out of the Firm to avoid leaving his clients without counsel.

### *Jonathan*

Samuel agreed to supervise Jonathan after his suspension and signed the 5.3 Agreement on behalf of the Firm. Samuel reviewed Rule 5.3 to identify his supervisory

13

responsibilities and met with Hesselbacher. Samuel told Jonathan that he "could not do legal work, go to court, attend depositions, advise clients, or give legal advice, and if he had any questions he should consult with Mr. Hesselbacher and follow his advice." The hearing judge found that Jonathan's role in the Firm was "to perform clerical and administrative duties[,]" and Samuel did not ask Jonathan to write checks on the trust account or perform legal work.

## Allegations of Misrepresentation by Jonathan

Bar Counsel alleged that Jonathan made multiple misrepresentations. The hearing judge considered these allegations in three different contexts: Jonathan's attempt at reinstatement, Jonathan's statement under oath on December 29, 2014 ("December Statement"), and Jonathan's deposition on April 20, 2017.

### *Reinstatement*

Bar Counsel charged Jonathan with making misrepresentations to Bar Counsel in his bid for reinstatement, his Petition for Reinstatement, and his responses to Bar Counsel's filings with the Court of Appeals.

In January 2014, Hesselbacher sent Bar Counsel: (1) a supplemental Rule 16-760 affidavit; (2) a Rule 16-781(g) affidavit; and (3) a Rule 16-781(d) Statement. Bar Counsel alleged that Jonathan made three misrepresentations in these documents by: (1) asserting in his Rule 16-781(g) affidavit that he had complied with the requirements of Md. Rule 16-760; (2) certifying in the 16-781(g) affidavit that since his suspension, he had not "engaged in the practice of law or attempted or offered to engage in the unauthorized practice of law. . . ."; and (3) stating that the 5.3 Agreement was effective July 10, 2013 in his Rule

14

16-781(d) statement, thus misrepresenting by omission and failing to disclose that the 5.3 Agreement was actually created in December 2013. Rather, Jonathan stated that the Agreement was "inadvertently not provided sooner."

The hearing judge concluded Jonathan's assertion that he had complied with the requirements of Md. Rule 16-780 was not accurate for two reasons. First, Jonathan violated Rule 16-760(c)(11) by "failing to timely draft and submit the [MLRPC] 5.3(d)(3) notice and agreement . . . ." Second, Jonathan violated Rule 16-760(d)(3) because he wrote checks on the trust account after his suspension.

The hearing judge found that the Hill e-mail was not the practice of law because it was the kind of correspondence "that could have been sent by an assistant or a paralegal, not necessarily a lawyer." Therefore, the 16-781(g) affidavit was not "knowingly false."

With regard to the 5.3 Agreement, Hesselbacher and Jonathan discussed various limitations on suspended attorneys working in their former firms, but there was no indication that they discussed the requirement of a written employment agreement. Hesselbacher's testimony that he had overlooked the 5.3(d)(3) requirement was consistent with the Respondents' inadvertent failure to file the agreement in the appropriate time.

Bar Counsel alleged that Jonathan made repeated knowing and intentional misrepresentations to deceive the Court of Appeals and Bar Counsel about whether he had engaged in law-related activities during his suspension. Specifically:

1. Hesselbacher's March 2014 e-mail misrepresented the activities Jonathan had been performing in the Firm.

2. Jonathan's Petition for Reinstatement and his Reply to Bar Counsel's Response to his Petition both included affidavits stating that he had not engaged in the practice

15

of law, attempted, or offered to do so, and that his employment at the Firm only were "purely clerical or administrative . . . ."

3. Jonathan's Reply to Bar Counsel's Supplemental Response to Jonathan's Petition for Reinstatement contained misrepresentations and omissions about the scope of his conduct in writing checks on the trust account.

With regard to the first and second allegations, the hearing judge reiterated his earlier findings that the Hill e-mail was the only law-related activity Jonathan engaged in, that itself was in a "gray area," and that Jonathan had not "engaged in the practice of law after his suspension." Therefore, the statements were not misrepresentations.

In June 2014, Bar Counsel filed a Supplemental Response to Jonathan's Petition for Reinstatement, which stated that Jonathan had written checks on the trust account payable to cash after his suspension. Jonathan filed a Reply, which included an affidavit stating:

> 2. On several occasions, when one of the other signatories on the account was not available, I was asked to write checks from the escrow account for payment of fees the law firm had earned. I was instructed that the check should be made payable to 'cash' to enable faster crediting of the check by the bank, Wells Fargo Bank. In each instance, the check was deposited into the firm's operating account, and it was my understanding that the check represented proper payment of an earned fee. It is my recollection and understanding that the purpose of each check was recorded in the check register, deposit record[,] or both.
>
> 3. With specific regard to the check Bar Counsel submitted with the Supplemental Response to my petition for reinstatement, I was requested by Mr. Leonard Sperling to write and deposit a check in partial payment of the firm's fee for representation of a particular client, and I did so. It was and is my understanding that the fee payment was proper. I deposited the check in the firm's operating account. . . .
>
> 4. At the time I made this and several similar deposits and until Bar Counsel contacted my attorney last week, I did not

16

> realize that the Maryland Rules prohibited an escrow account check from being made payable to cash even when the purpose of the check is proper and the purpose is identified in trust account records. . . .

Bar Counsel alleged that Jonathan knowingly and intentionally omitted a material fact—that he had acted at the direction of Leonard, a suspended attorney. The hearing judge disagreed that this was a material omission made with intent to mislead the Court of Appeals and Bar Counsel. But he found that Jonathan "has significantly understated how many times he was directed to write checks on the attorney trust account," because "several occasions" was not an accurate description of the number of checks Jonathan wrote.

### *The December Statement*

Bar Counsel argues that Jonathan testified falsely to subvert the investigation during his statement under oath in December 2014 when he testified that he could not recall whether: (1) Samuel supervised him immediately after his suspension; (2) Samuel instructed him to write checks from the trust account payable to cash; (3) he discussed his trust account activities with Samuel after his suspension; (4) there were any problems with the trust account before Bar Counsel sought a TRO; and (5) he had ever discussed Leonard's presence at the firm after Leonard was suspended with Samuel.

The hearing judge found that Bar Counsel did not prove by clear and convincing evidence that Jonathan's inability to recall whether Samuel supervised him initially was not true. Jonathan testified that Samuel was involved in his supervision and provided a description. Accordingly, his answer was not intended to obstruct Bar Counsel's

investigation. Further, Jonathan did not testify falsely when he stated that he did not remember, given the chaotic circumstances then prevailing in the Firm.

### *Jonathan's Deposition*

During Jonathan's April 2017 deposition, he testified that he provided his login credentials for his computer to everyone in the office so they could use his computer, and that Loewenthal and Babest used his credentials. Both Babest and Loewenthal testified that Jonathan had never provided his credentials.

### Allegations of Misrepresentation by Samuel

Bar Counsel contended that Samuel made multiple misrepresentations on three separate occasions: (1) in his May 30, 2014 affidavit; (2) in a 2014 letter to the State Department of Assessment and Taxation ("SDAT"); and (3) during his March 30, 2015 statement under oath.

### *The May 2014 Affidavit*

Bar Counsel sent Samuel a letter in April 2014 notifying him that the AGC was investigating possible violations of the MLRPC and asking for information regarding his supervision of Jonathan, Leonard's employment status with the Firm, and any changes to the trust account following Leonard's suspension. Bar Counsel also served Samuel with a subpoena for the Firm's financial records. McCabe sent a response to Bar Counsel that included an affidavit signed by Samuel.

Bar Counsel alleged that Samuel made seven false statements in his affidavit: (1) Samuel did not have managerial authority in the Firm; (2) Jonathan did not draft legal documents; (3) Jonathan did not receive client funds or make disbursements; (4) Jonathan

18

signed the 5.3 Agreement on July 10, 2013; (5) the term "paralegal" as used in the 5.3 Agreement did not include drafting pleadings or discovery, communications with clients about cases, or legal research; (6) Samuel was not responsible for supervising Leonard after his suspension; and (7) Samuel had not delegated any legal tasks or law-related activity to Leonard after his suspension.

The hearing judge found that Bar Counsel failed to prove that any of these statements were misrepresentations because there was not sufficient evidence or law to support Bar Counsel's assertions. Although Samuel's statement about when the 5.3 Agreement was signed was "clearly wrong," the hearing judge determined that it was not an intentional misrepresentation, and Samuel had no motive to misrepresent that fact—both Respondents admitted that they violated 5.3(d)(3) by the late filing.

### *The SDAT Letter*

In September 2014, Samuel wrote a letter to SDAT stating that he was not the Vice President of the Firm, and that he had never controlled the Firm's financial decisions. Bar Counsel argued that this was an intentional misrepresentation. The hearing judge concluded that there was "no evidence that Samuel was 'solely responsible for the [F]irm's bank accounts' or that he controlled the [F]irm's finances . . . ." Therefore, Bar Counsel failed to prove that this was an intentional misrepresentation.[13]

---

[13] Bar Counsel also alleged that a December 5, 2014 letter from Jonathan's counsel contained a similar misrepresentation—that Leonard handled the Firm's finances, paid the bills, and kept control over the Firm at all times. The hearing judge found that the evidence did not support Bar Counsel's allegations.

19

***The March Statement***

Samuel made a statement under oath to Bar Counsel on March 30, 2015, which Bar Counsel alleges was intended to obstruct the investigation by "testifying that he was unable to recall, or did not know, a number of material facts . . . ."  Specifically: (1) whether Samuel had any conversations with Leonard after Jonathan was suspended about what Jonathan could or could not do under the MLRPC; (2) when Samuel signed the 5.3 Agreement; (3) who drafted the 5.3 Agreement; (4) whether after Leonard's suspension, letters were sent to Firm clients notifying them of the suspension and that they could retain Samuel to represent them, or if Samuel discussed individual client matters with Leonard after his suspension; (5) the number of cases Leonard was involved in at the time of his suspension, or whether Samuel prepared lines substituting his appearance for Leonard's; (6) the checks Leonard wrote from the trust account after his suspension; and (7) whether Leonard had any input into deposits and withdrawals from the trust account after he was suspended.

The hearing judge observed that Bar Counsel "ha[d] not cited or referred to any evidence in support of its allegations other than to the statements themselves," and found that Bar Counsel had not shown any evidence that the statements were not true.

Bar Counsel also claimed that Samuel knowingly and intentionally testified falsely that: (1) Jonathan did not draft any interrogatories or pleadings for Samuel after he was suspended; (2) Leonard was only involved in administrative and clerical matters after his suspension; (3) Samuel could not identify Leonard or Jonathan's handwriting in the Firm's

20

trust account ledgers; and (4) Samuel learned for the first time in August 2014 that Leonard had settled cases after his suspension.

The hearing judge found that Bar Counsel failed to prove that any of these statements were not true by clear and convincing evidence. Although he observed that Samuel's June 2014 e-mail to McCabe "suggests that Samuel learned by at least early June 2014 that Leonard had settled cases and was continuing to write checks on the escrow account," he did not find, from a two-month discrepancy alone, that Samuel made an intentional misrepresentation.

### Luvenia Jeter

Luvenia Jeter had been a student in the Practical Nursing Program at Hagerstown Community College ("College") but was terminated after her third semester when she failed the clinical course. She thought that her termination was unfair, so she contacted the Baltimore County Referral Service and was referred to Jonathan.

Jonathan and Jeter met at least twice at the Firm. At the first meeting, in early January 2012, which lasted about an hour and a half, Jeter "wanted to talk and wanted someone to listen to her and tell her if she had a case." They discussed the viability of a claim for unfair dismissal, and Jonathan told Jeter that her case was a "challenge." He also advised that the statute of limitations was three years. Jeter paid the Referral Service $35 for the initial consultation and Jonathan $350. At the second meeting, which lasted two hours, Jeter provided documents for Jonathan's review, including her Clinical Performance Assessment and her own notes regarding the assessment. Jonathan agreed to communicate with the College.

21

Jonathan sent two letters to different individuals associated with the College asking to discuss Jeter's dismissal. He received a response from the program director "informing him that 'Ms. Jeter failed Nursing 113 due to both safety and academic reasons[,]'" and that Jeter had not contacted her with any issues or initiated the grievance process.

In March, Jeter gave Jonathan a check for $2,000 as a retainer and signed a retainer agreement with the Firm. "The retainer agreement provided for a $2,000 retainer and a contingent fee of 25% of any recovery." Jonathan sent the College notice under the State and Local Government Torts Act in April, and in May, he sent Jeter a draft complaint against the College "to be filed forthwith." Jonathan testified that "after a lot of effort and searching" he spoke with program staff "in or after May 2012," and learned that Jeter's termination was justified because she "could not perform the activities necessary to continue in the program . . . ."

After discussing Jeter's performance in the program, reviewing documents, transcripts, and the director's letter, as well as meeting with Jeter, "Jonathan concluded that Ms. Jeter did not have a good faith basis to go forward with a claim." He testified that after May 2012, he spoke to Jeter by telephone, discussed the matter with her, and told her that there was no basis to move forward with her claim. Jonathan testified that he had a handwritten note that confirmed his call, which Bar Counsel contended he had "fabricated." Jeter disagreed with Jonathan, asserting that Jonathan never called her after sending the draft complaint.

Jeter testified that she called Jonathan's office regularly but was unable to reach him. She stated that she called the courthouse "in the middle of last year, 2016," and

22

learned that Jonathan did not file the suit, after which she filed a complaint with Bar Counsel. The hearing judge was unable to ascertain "whether the phone call occurred between Ms. Jeter and Jonathan after May 2012, and whether [Jonathan] informed her of his determination not to go forward with her case." Regarding his fee, "Jonathan testified that he spent over 20 hours investigating the case at a rate of $150 per hour. . . . [but] did not maintain time records, provide Ms. Jeter with an accounting, or determine a date when the fee was earned."

Jeter's assertions did not correspond with events. She had communications with Jonathan after paying him and her claim that she had called the courthouse in mid-2016 and then complained to the AGC was inconsistent with the date of her AGC complaint which was filed in January 2016. After Jonathan's letter to Bar Counsel stating that Jeter's grades were poor, Jeter represented to Bar Counsel that she was "virtually an 'A' student" before her dismissal. The hearing judge reviewed Jeter's transcripts, and observing that she had failed the clinical component, and never earned an A, he found it reasonable to conclude that there was no basis to file suit. Additionally, Jeter's decision to file a complaint four years later supported "that she was told that Jonathan would not go forward with her case and over time she may have forgot[ten] that the call occurred."

### THE HEARING JUDGE'S CONCLUSIONS OF LAW

#### Conclusions of Law: Samuel

##### *MLRPC 1.15(a) and (d): Safekeeping Property*

The hearing judge explained that "the essence of the claim . . . is not imputed liability for Leonard's misappropriation of funds from the account, but Samuel's own

23

failure to safeguard the funds in the attorney trust account." Samuel should have known that someone else was writing checks, and a cursory review of the Firm's bank statements would have confirmed any suspicions. Samuel took no action until June 2014 to prevent Leonard's activities, he did not supervise Leonard's access, or perform monthly reconciliations. Samuel deposited client funds into the trust account and made disbursements, and he was the only licensed attorney in the office with signatory authority, consequently, he had "the duty and the right to safeguard the funds in the attorney trust account." Therefore, Samuel violated 1.15 "by his lack of oversight of the attorney trust account."

### MLRPC 5.3: Responsibilities Regarding Nonlawyer Assistants

With regard to Samuel's responsibility for Leonard, the hearing judge concluded that Samuel did not violate 5.3 as it applied to Leonard. Samuel did not have managerial authority in the Firm and did not order or ratify Leonard's conduct. He did not employ Leonard—he was Leonard's employee.

Turning to Samuel's responsibility for Jonathan, the hearing judge found that 5.3(b), (c), and (d) were relevant because Samuel was the only lawyer supervising Jonathan after Leonard's suspension and Samuel signed the 5.3 Agreement. Because Bar Counsel failed to prove that Jonathan had engaged in any law-related activities, except for the Hill e-mail, which Samuel knew nothing about, there was "not proof that Samuel failed to take reasonable steps to supervise Jonathan." The hearing judge found that Samuel and Jonathan violated 5.3(d)(3) because they did not draft and file the 5.3 Agreement within the mandated deadline.

The hearing judge reasoned that Samuel failed to "make reasonable efforts to ensure that Jonathan did not continue to write checks on the attorney trust account after his suspension." Therefore, "Samuel violated 5.3(b) as to his supervision of Jonathan." Because there was no evidence that the checks Jonathan wrote were related to Leonard's misappropriation, Bar Counsel did not prove that Samuel could have avoided the consequences of Leonard's misappropriation when he learned that Jonathan was writing checks on the account. For that reason, Samuel did not violate 5.3(c).

### MLRPC 5.4(a) and (d): Professional Independence of a Lawyer

Samuel did not violate 5.4(a) because there was no evidence that he shared legal fees with, or paid legal fees to Leonard after Leonard's 2013 suspension. Samuel did violate 5.4(d)(1) because "he continued to practice in a professional corporation owned by Leonard after Leonard's suspension."

### MLRPC 5.5(a): Unauthorized Practice of Law; Multijurisdictional Practice of Law

Bar Counsel failed to prove that Samuel violated 5.5(a) as to Jonathan because there is no "clear and convincing evidence that Jonathan engaged in the practice of law after his suspension or that Samuel assisted him in doing so." Samuel did not violate this Rule as to Leonard because "Samuel did not supervise Leonard or control the [F]irm and there is no evidence that Samuel 'permitted'" or assisted Leonard's unauthorized practice of law.

### MLRPC 8.1: Bar Admission and Disciplinary Matters

Samuel did not violate 8.1(a) because he did not make any knowingly false statements in his May 2014 letter, or in his March 2015 statement under oath. Regarding 8.1(b), Bar Counsel did not "prove[] by clear and convincing evidence that Samuel

25

'knowingly failed to respond' to Bar Counsel's questions . . . ." The hearing judge also found that Samuel did not refuse to provide information "associated with the creation date of the 5.3 Agreement."

### *MLRPC 8.4(a)–(d): Misconduct*

Samuel violated 8.4(a) because he violated MLRPC 1.15, 5.3(b) and (d)(3), and 5.4(d)(1). Samuel, however, did not assist Leonard in theft and embezzlement, or commit perjury in his May 2014 affidavit, or his March 2015 statement under oath. Samuel did not make misrepresentations in his letter to SDAT. Bar Counsel did not prove that "information about the employment contract was fabricated, deleted, or withheld from Bar Counsel." The hearing judge found that Samuel did not violate 8.4(b)–(d).

### Conclusions of Law: Jonathan

### *MLRPC 1.1, 1.2(a), 1.3, 1.4, 1.5(a)–(b), 1.16(d)*

Bar Counsel failed to prove by clear and convincing evidence that Jonathan violated 1.1, 1.2(a), 1.3, 1.4, 1.5(a)–(b), or 1.16(d) because the evidence available to Jonathan suggested that Jeter's termination from the nursing program was justified, and "it was a reasonable conclusion by Jonathan that there was no good faith basis to file the lawsuit." Jonathan had two meetings with Jeter, listened to her, discussed her claims, reviewed documents, and contacted individuals at the College. Bar Counsel did not prove that Jonathan failed to speak to college officials, or that Jonathan neglected to call Jeter once he concluded that she had no case. The judge considered that the facts demonstrated that Jonathan could reasonably have found that Jeter's termination was valid. Bar Counsel failed to prove that Jonathan did not tell Jeter that he had not filed suit, or that he did not

26

think she had a basis to bring the suit. Regarding fees, the hearing judge found that Jonathan performed legal services for Jeter, and "[m]erely because Jonathan concluded that Ms. Jeter did not have a meritorious claim does not mean there was no value for Jonathan's investigation."

### *MLRPC 8.1: Bar Admission and Discipline*

Jonathan violated 8.1(a) "by his statement in his Rule 16-781 affidavit that he had complied with Rule 16-760[]" because Jonathan knew that he had violated Rule 16-760(c)(11) by not filing the 5.3 Agreement within 30 days of beginning his employment as a paralegal with the Firm, and by writing checks on the attorney trust account in violation of Rule 16-760(d)(3) before he signed the affidavit. Jonathan's statement that he wrote checks "'on several occasions' [was] a misrepresentation" in violation of 8.1(a). The hearing judge concluded that Bar Counsel had not proved any other allegations of misrepresentation by clear and convincing evidence.

### *MLRPC 8.4(a)–(d): Misconduct*

By violating 8.1(a) and 5.3(d)(3), Jonathan violated 8.4(a) and (c). The hearing judge concluded, however, that because Bar Counsel "failed to prove that Jonathan had engaged in the practice of law or attempted to engage in the unauthorized practice of law," Bar Counsel had not proved that Jonathan committed perjury in his Rule 16-781(g) affidavit. Bar Counsel failed to prove that Jonathan violated 8.4(d) because she had stated that his conduct as a whole violated the Rule, but she had not proved a number of allegations by clear and convincing evidence.

**Aggravating and Mitigating Factors**

Bar Counsel alleged the existence of multiple aggravating factors for Samuel, but the hearing judge concluded that none applied. He did find multiple aggravating factors as to Jonathan. The hearing judge also found substantial mitigation for both brothers. We discuss these matters in greater detail below.

**DISCUSSION**

"In attorney discipline proceedings, this Court has original and complete jurisdiction and conducts an independent review of the record." *Attorney Grievance Comm'n v. McClain*, 406 Md. 1, 17 (2008). We accept the hearing judge's findings of fact unless they are clearly erroneous, and we defer to the hearing judge's assessment of the witnesses' credibility. *Attorney Grievance Comm'n v. Ugwuonye*, 405 Md. 351, 368 (2008). We review the hearing judge's legal conclusions without deference. *Attorney Grievance Comm'n v. Hamilton*, 444 Md. 163, 178 (2015).

Both parties may file "exceptions to the findings and conclusions of the hearing judge" and recommendations for the appropriate sanction. Md. Rule 19-728(b). If a party excepts, we determine whether the findings of fact were proven by the relevant standard in Md. Rule 19-727(c). Md. Rule 19-741(b)(2)(B). We may limit our review to the findings of fact challenged by the exceptions. *Id.* If no exceptions are filed, we may treat the findings of fact as established. *Id.* (b)(2)(A).

**Samuel**

Bar Counsel excepts to the hearing judge's factual finding that Samuel lacked managerial authority in the Firm, and consequently to the hearing judge's conclusion that

Samuel did not violate 5.3(a)–(d), 5.4(a), and 5.5(a), as applied to Leonard. Bar Counsel also contends that the hearing judge erred in finding that Samuel did not violate 8.1(a) and 8.4(b)–(d). Samuel excepts to the finding that he violated 1.15, asserting that the hearing judge erred in concluding that Samuel had an affirmative duty to protect client funds. Samuel reasons that because he was an employee and lacked managerial authority, he had no duty to take over the account when Leonard was suspended, absent actual knowledge of Leonard's misconduct. We first consider Samuel's authority in the Firm because that analysis determines whether we sustain or overrule numerous legal exceptions.

Bar Counsel offers certain facts from the record to support the argument that Samuel had managerial authority, or at least direct supervisory authority, over Leonard's use of the trust account, and that Samuel employed Leonard after his suspension. These facts include that Samuel was named as one of the two directors of the Firm in the 2004 Articles of Incorporation, and no document has demonstrated that Samuel was removed. Samuel also served as the Firm's resident agent. Bar Counsel asserts that Samuel established the Firm's trust account. Samuel received both a W-2 and a Schedule C. Samuel supervised Jonathan after his suspension.

Bar Counsel places great weight on two particular facts relating to the aftermath of Leonard's suspension: (1) Samuel was the only licensed attorney with signatory authority on the trust account; and (2) Samuel was the only Sperling licensed to practice law associated with the Firm. Bar Counsel also asserts that Samuel had authority to sign contracts on behalf of the Firm. Following Leonard's suspension, Samuel took on additional responsibilities and instructed Leonard to consult with, and follow, his attorney's

29

advice. In June 2014, Samuel "affirmatively took control of the [F]irm," instructed Leonard not to write checks from the trust account and took over responsibility for "all settlements of client matters."

Judge Stringer's assessment that Samuel lacked managerial authority was based on five days of testimony and volumes of evidence. We defer to his assessment of witness credibility because he was in the best position to draw those conclusions. *Attorney Grievance Comm'n v. Sheridan*, 357 Md. 1, 17 (1999).

The Firm established the trust account in 2004. The account application identifies the signatories, but Leonard, not Samuel signed the application for tax reporting purposes. The Firm's tax documents identified Leonard as the sole shareholder and officer of the Firm. Samuel testified that he did not remain a director after Leonard's 2004 reinstatement, and the hearing judge found this testimony credible. Samuel remained the Firm's resident agent, but all Maryland corporations are required to designate at least one resident agent. *See* Md. Code (1975, 2014 Repl. Vol.), § 2-108(a)(2) of the Corporations & Associations Article. Bar Counsel has not supplied any authority supporting the proposition that resident agent status is accompanied by managerial control over a corporation. Although the Firm was called "The Sperling Law Office, P.C.," we do not conclude that sharing a surname with the owner of a professional corporation automatically endows managerial authority.

Samuel testified that he received a Schedule C for a portion of new business fees he generated. Babest, although not offering specifics regarding tax documentation, testified that the Firm's general policy was to give attorneys who generated new cases for the Firm a share of attorneys' fees. Leonard, however, was the only individual at the Firm who

30

received a K-1. Bar Counsel has not offered any relevant evidence regarding the import of the Schedule C.

Samuel never stated that he had broad authority to sign contracts on behalf of the Firm. During his March 2015 statement, Samuel testified that he signed the 5.3 Agreement for Jonathan "as an agent" of the Firm because Leonard had given him the authority to do so. Likewise, Samuel was Jonathan's supervisor because Leonard asked him to take on that responsibility. Samuel was not asked and did not agree to become Leonard's supervisor.

Following Leonard's suspension, the Firm carried on through a "collaborative effort," and the associated attorneys were not sure who managed the Firm. Loewenthal testified that Samuel "took a more active role," but that others in the Firm also did more. Babest and Loewenthal did not consider Samuel to be their supervisor. Samuel advised his father to consult with Hesselbacher and to follow his advice. Samuel's choice of the word "instructed" is not, by itself, sufficient to indicate that he assumed managerial authority.

Our review of the record shows that Leonard, apparently indifferent to his suspension, continued running the Firm. Samuel confronted his father in June 2014 and told him he had to stop signing checks. He did not take sole responsibility for handling settlements—he told Leonard that settlements had to be handled by an attorney. Samuel formed the LLC and began transitioning out of the Firm.

31

Leonard's suspension did not convert Samuel into his employer in a corporation Leonard owned.[14] Bar Counsel has not offered any facts showing this change in relationship, or any authority that could persuade us to conclude otherwise. Thus, we overrule Bar Counsel's factual exception.

**Jonathan**

Bar Counsel excepts to the hearing judge's findings and conclusions regarding Jonathan's communications and submissions to Bar Counsel. Specifically, Bar Counsel asserts that the hearing judge should have found that Jonathan made three additional misrepresentations: (1) Jonathan misrepresented in his Rule 16-781(g) affidavit that he had not engaged in the practice of law because he knew he gave legal advice in the Hill e-mail; (2) Jonathan misrepresented the tasks he performed for the Firm in a March 2014 e-mail drafted and submitted by his attorney; and (3) Jonathan made additional misrepresentations in a December 2014 letter to Bar Counsel.

Bar Counsel also asserts that the hearing judge should have found additional violations of 8.4(c), presumably related to the alleged misrepresentations discussed above. She also urges this Court to find that Jonathan violated 8.4(b) because he committed perjury when making misrepresentations in his Rule 16-781(g) affidavit. Finally, Bar Counsel excepts to the hearing judge's conclusion that Jonathan did not violate 8.4(d) arguing that Jonathan's conduct, "taken as a whole, . . . brings the legal profession into disrepute in violation of Rule 8.4(d)."

---

[14] Leonard employed Samuel. After Leonard's suspension, Samuel continued working for him. As we explain, *infra*, this conduct violated MLRPC 5.4(d).

Jonathan asserts that the hearing judge erred by finding that he failed to acknowledge any wrongdoing and that he acted with a selfish or dishonest motive. Jonathan also excepts to the hearing judge's conclusion that he violated 8.1(a), insisting that his use of "imprecise language," specifically the phrases "on several occasions" and "several similar deposits" used to describe the checks Jonathan handled at the Firm, does not rise to an 8.1(a) violation. Jonathan challenges the hearing judge's conclusion that he misrepresented, in a statement made under oath, that he provided his computer login credentials to other employees at the Firm. Jonathan contends the hearing judge should not have found a violation of 8.4(c) because his misconduct was negligent, rather than intentional. Finally, Jonathan argues that the hearing judge should have found that he had an enforceable settlement agreement with Bar Counsel.

## Conclusions of Law

### *Samuel*

### MLRPC 1.15

MLRPC 1.15(a) creates an affirmative obligation for a lawyer to hold the property of clients or third persons in a lawyer's possession separately from the lawyer's own property, maintain records, and safeguard client funds. *See, e.g.*, *Attorney Grievance Comm'n v. Glenn*, 341 Md. 448, 472 (1996). Samuel received client funds and deposited them in the Firm's trust account from July 2013 until the TRO was entered in 2014. He had signatory authority over the account.

When an attorney is the only party responsible for managing a trust account, the attorney must ensure that the management of the accounts complies with the Maryland

33

Rules. *Attorney Grievance Comm'n v. Shephard*, 444 Md. 299, 330 (2015). Attorneys, however, retain their 1.15(a) responsibilities regardless of whether other attorneys have authority to manage funds. This is illustrated in *In re Woiccak's Case*, 561 A.2d 1049 (N.H. 1989). Woiccak established a firm with two other attorneys who were not admitted in New Hampshire. *Id.* at 1049–50. Woiccak was not the managing partner. The firm's account was badly out of trust, and records were improperly kept. *Id.* at 1051. Woiccak contended that he had no actual knowledge of the use of the client funds, and that he was not responsible for managing the accounts. The Supreme Court of New Hampshire rejected these arguments because evidence showed that Woiccak was aware of problems with the accounts. Further, Woiccak "had the responsibility as a fiduciary, and particularly as the only partner licensed to practice law in this State, to ensure that the integrity of client trust accounts was being maintained." *Id.* at 1052.

Samuel was not a managing partner or sole signatory. But like Woiccak, he was the only signatory licensed to practice in Maryland. Because he used the trust account to hold funds he received from and on behalf of clients, he had an affirmative obligation under 1.15(a) to safeguard those funds.[15] The hearing judge correctly found that Samuel had "the duty and the right to safeguard the funds in the attorney trust account."

---

[15] We do not suggest that every attorney associated with a law firm is required to continually monitor the firm's accounts. This would be impracticable, particularly in large law firms. An attorney may certainly satisfy his or her affirmative 1.15(a) obligation by understanding the firm's policies regarding handling client funds, and complying with those policies, provided such policies are consistent with the ethical and legal duties imposed by the Maryland Attorneys' Rules of Professional Conduct.

34

Samuel recorded his deposits and disbursements in the Firm's ledgers but did not review bank records or perform monthly reconciliations. There is no evidence whether anyone performed reconciliations. But a review of the Firm's ledgers and bank statements would have immediately demonstrated that someone other than Samuel was writing checks—as Judge Stringer observed "either he would have seen ledger entries and check stubs filled out by someone else, or he would have seen that checks were missing that he did not write." Leonard had also written checks to Samuel after his suspension, which Samuel endorsed.

In April 2014, Samuel received a communication from Bar Counsel that the account had been overdrawn. A balance in the trust account below the required amount of funds to be held is prima facie evidence of a 1.15(a) violation. *See Attorney Grievance Comm'n v. Mungin*, 439 Md. 296, 290 n.2 (2014); *Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 355 (2005); *Glenn*, 341 Md. at 472. Bar Counsel's notice was certainly sufficient to advise Samuel that there were problems with the trust account. Yet Samuel continued depositing client funds into the account and apparently did not review the account's records.

Relying on *Attorney Grievance Comm'n v. Pennington*, 387 Md. 565 (2005), Samuel asserts that his actions were reasonable because he directed Leonard and Jonathan to speak with Hesselbacher about their permissible post-suspension activities. In *Pennington*, an attorney sought legal advice from counsel not admitted in Maryland regarding her obligations after a filing error at the clerk's office resulted in her clients' case being dismissed with prejudice. *Id.* at 572–73. She claimed that the consultation rendered

35

her subsequent action reasonable because she relied in good faith on her lawyer's advice. We rejected this argument. *Id.* at 589–90. Maryland attorneys are bound to comply with the MLRPC and may not delegate that responsibility by relying on advice of counsel. *Id.*

Leonard and Jonathan certainly should have consulted with their attorney regarding permissible post-suspension conduct. That Samuel directed them to do so does not excuse his inattention to the trust account or render his neglect reasonable. Samuel could have—and should have—done more. Had he exercised any oversight of the trust account, he would have discovered that Leonard and Jonathan were writing checks. *See Attorney Grievance Comm'n v. Smith*, 443 Md. 351, 382 (2015).

Samuel did not misappropriate funds and he was unaware of his father's misappropriation. We agree with the hearing judge that Samuel's liability is not based on Leonard's conduct—rather it stems from Samuel's failure to act. But an unintentional violation of 1.15(a) is still a violation. *Glenn*, 341 Md. at 472. We overrule this exception and conclude that Samuel violated 1.15(a).

Bar Counsel also charged Samuel with a violation of 1.15(d). This rule requires an attorney, upon receiving funds or property in which a client or third person has an interest, to promptly notify the interested parties and deliver the funds or other property they are entitled to receive, as well as render a full accounting upon request. *See Mungin*, 439 Md. 308–09; *Smith*, 443 Md. 373–74. The hearing judge concluded that Samuel violated 1.15, without specifying the conduct violated that 1.15(d). He found that Samuel represented "at least three clients whose cases he settled and deposited their money in the trust account, but the money was not disbursed to the client[s]."

36

*The White and Rodriguez Funds*

Samuel testified that he had represented Karen and Amani White and that he had probably settled their claims and would have deposited their settlements—$5,000 and $2,000 respectively, into the trust account. Samuel did not recall making any disbursements. The record shows that the settlement checks were issued on July 23, 2014, endorsed by the clients, and deposited in the trust account on July 25, 2014. The Whites and their medical lien holders did not receive any disbursements. They were referred to the Client Protection Fund.

Samuel also represented Orlando Rodriguez and settled a claim on his behalf for $7,000. He received two checks for $3,500, one before the TRO went into effect, and one after. The first check was issued on July 24, 2014. Rodriguez endorsed the check and it was deposited into the trust account on July 31, 2014, the day before the TRO went into effect. Samuel did not make any disbursements from the first check. He disbursed the second check after discussions with Gilliss. Rodriguez was referred to the Client Protection Fund for the first check.

The Whites and Rodriguez endorsed the checks, which indicates that they were promptly notified of the receipt of funds. There is no evidence about whether lien holders were notified. Our cases finding a 1.15(d) violation show a prolonged gap between receipt of funds and disbursal as well as a complete failure to notify anyone. *See Mungin*, 439 Md. at 308–09 (violation found after months and years of delays in distributing funds without a valid reason); *Smith*, 443 Md. at 374 (violation found for failing to notify clients and third-party providers on receipt of funds and delays in disbursements for over a year);

37

*see also Attorney Grievance Comm'n v. Goodman*, 426 Md. 115, 126 (2012); Attorney *Grievance Comm'n v. Roberts*, 394 Md. 137, 154–55 (2006); *Attorney Grievance Comm'n v. Cherry-Mahoi*, 388 Md. 124, 146–47 (2005).

Samuel failed to safeguard his clients' funds. But he only had the funds for the Whites and Rodriguez for a brief period of time before the TRO took effect. Even if the funds had remained in the account, he would have been prohibited from disbursing them. We conclude that this evidence is not sufficient to conclude that he violated 1.15(d).

### MLRPC 5.3: Samuel's Responsibility for Leonard

5.3(a) imposes responsibility on "a partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm" to make reasonable efforts to ensure the firm has measures in place to ensure that nonlawyers employed, retained by, or associated with a lawyer conduct themselves in a manner "compatible with the professional obligations of the lawyer." 5.3(b) requires that a lawyer who has "direct supervisory authority over the nonlawyer" must make "reasonable efforts" to ensure that the nonlawyer's conduct is compatible with a lawyer's professional obligations.

Samuel certainly should not have continued working in a law firm owned by a suspended attorney. But the facts do not demonstrate that Samuel was a partner, that he had managerial authority, or that he directly supervised Leonard. We have overruled Bar Counsel's factual exceptions to Samuel's status in the Firm. Accordingly, we overrule Bar Counsel's exceptions to 5.3(a) and (b). We also overrule Bar Counsel's exception to 5.3(c)(2) for the same reasons. *See Attorney Grievance Comm'n v. Landeo*, 446 Md. 294,

38

338 (2016) (no liability under 5.3(c)(2) when attorney did not directly supervise staff). Samuel did not violate these Rules as applied to Leonard.

5.3(c)(1) imposes vicarious liability for the conduct of nonlawyers employed by, retained by, or associated with a lawyer that would violate the MLRPC. The lawyer may be held responsible if the "lawyer orders, or with the knowledge of the specific conduct, ratifies the conduct involved[.]" *Id.* Bar Counsel claims that Samuel's "inaction following his actual knowledge of Leonard's misconduct amounted to ratifying the conduct."

To ratify a nonlawyer's conduct, the lawyer must have **knowledge of the specific conduct involved**. MLRPC 5.3(c)(1). In *Attorney Grievance Comm'n v. Phillips*, 451 Md. 653, 660–61 (2017), Phillips's son, a nonlawyer, established a law firm including himself and his father, and Phillips consented to be a member of the firm. His son sent a cease and desist letter on behalf of an acquaintance on the firm's letterhead and signed Phillips's name. *Id.* at 661. Phillips initially disavowed knowledge, but later sent an e-mail to the recipient of the letter stating that the firm represented the acquaintance and that a junior attorney had sent the letter. We concluded that this e-mail ratified the unauthorized practice of law. *Id.* at 673. Similarly, in *Attorney Grievance Comm'n v. Barton*, 442 Md. 91, 137–38 (2015), an attorney ratified her employee's theft of client funds by providing blank checks and not reviewing bank statements even after she caught him stealing.

Samuel certainly should have known that his father was writing checks. But unlike the attorney in *Barton*, Samuel did not know that his father was misappropriating funds. Leonard had written some checks to Samuel after the suspension, but there is no evidence that they related to Leonard's misappropriation. The hearing judge concluded that Samuel

39

did not order or ratify his father's conduct. We agree that this is not clear and convincing evidence that Samuel is liable for Leonard's misappropriation under 5.3(c)(1) and overrule Bar Counsel's exception.

5.3(d) imposes responsibilities on a lawyer who "employs or retains" the services of a formerly admitted attorney. As we concluded above, Samuel did not have managerial or supervisory authority in the Firm. Before Leonard's suspension, Samuel was Leonard's employee. There is no evidence demonstrating a change in corporate structure or ownership. We agree with the hearing judge that because Samuel did not employ[16] or supervise Leonard, he did not violate 5.3(d), and overrule Bar Counsel's exception.

### MLRPC 5.3: Samuel's Responsibility for Jonathan

Neither party has excepted to the hearing judge's conclusions of law regarding 5.3 as applied to Jonathan. Because Samuel did not have managerial authority in the Firm, and was not a partner, we find that he did not violate 5.3(a) as applied to Jonathan.

Turning to 5.3(b), we have found violations of this Rule when a lawyer who has direct supervisory authority over a nonlawyer employee fails to make reasonable efforts to ensure the nonlawyer's conduct conforms to an attorney's professional obligations. *See*

---

[16] Bar Counsel asserts that the hearing judge "apparently reasoned that Samuel's violation of Rule 5.4 provides him with a defense to a violation of Rule 5.3(d)[,]" and argues that this conclusion is against the public policy behind 5.3(d). But 5.3(d) delineates responsibilities for attorneys who employ formerly admitted lawyers—not vice versa. *See* Rules Order, 33 Md. Reg. 593 (Mar. 31, 2006).

Leonard employed Samuel. Without facts showing a change in the relationship, we do not find that Samuel violated Rule 5.3(d). Although Samuel undoubtedly should have taken a different course of action after his father's suspension, we do not conclude that when a lawyer who owns a professional corporation or other entity is suspended, his employees become his employer only by virtue of that lawyer's suspension.

*Zuckerman*, 386 Md. at 374 (attorney violated 5.3(b) by failing to verify employees' handling and reconciliation of the trust account). Samuel agreed to supervise Jonathan after his suspension.

Jonathan wrote 86 checks on the trust account after his suspension. A review of the Firm's ledgers and bank records would have revealed this activity. Samuel should have discovered Jonathan's misconduct far sooner than he did. Samuel directed Jonathan to consult with Hesselbacher and follow his advice. Samuel testified that he reviewed Rule 5.3 to understand a supervisor's obligations. These are appropriate first steps for a supervisory attorney, but the circumstances demonstrate their insufficiency. A lawyer may violate 5.3(b) even if he or she puts policies in place for nonlawyer employees but does not follow through on ensuring compliance. *See Glenn*, 341 Md. at 481 (attorney violated 5.3(b) because although he had a manual describing how to handle the trust account, he did not ensure employees understood or complied). Samuel failed to make reasonable efforts to supervise Jonathan's activity, thereby violating 5.3(b).

Samuel did not order or ratify Jonathan's activities with the trust account—he did not know what Jonathan was doing. This illustrates his failure to supervise but is insufficient to find a violation of 5.3(c)(1).

To impute an employee's misconduct to an attorney under 5.3(c)(2), four elements must be present: (1) the employee's misconduct would violate the MLRPC if the attorney did it; (2) partnership status or a direct supervisory relationship; (3) the attorney's knowledge of the misconduct at a time when the consequences could be mitigated; and (4) the attorney failed to take reasonable remedial action. *Smith*, 443 Md. at 380.

41

Applying this analysis to Jonathan, the first two elements are met. Jonathan wrote checks to cash from the trust account in violation of 1.15(a) and Md. Rule 16-609.[17] Samuel was his direct supervisor. Samuel first had actual knowledge that Jonathan was writing checks in June 2014 and directed him to stop. Bar Counsel has never shown that Jonathan's activities contributed to Leonard's misappropriations, or that Jonathan's activities harmed anyone. Therefore, it is not clear that Samuel learned of the wrongdoing at a time when the consequences could be mitigated. Jonathan wrote at least six more checks after Samuel told him to stop doing so, but there is no evidence that Samuel knew Jonathan ignored his directive. None of the checks were written to cash in violation of Md. Rule 16-609.[18] This certainly demonstrates Samuel's indifference to his supervisory obligation, but it is not sufficient to find a violation of 5.3(c)(2).

5.3(d)(2)(G) requires an attorney who supervises a formerly admitted lawyer to take reasonable steps to ensure that the formerly admitted lawyer does not "perform any law-related activity" for a law firm or lawyer "with whom the formerly admitted lawyer was associated when the act that resulted in the disbarment or suspension occurred . . . ." Bar Counsel charged that Samuel knew that Jonathan engaged in law-related activities for the

---

[17] MLRPC 1.15(a) requires attorneys to comply with Title 16, Chapter 600 of the Maryland Rules, including then-Rule 16-609, which prohibits writing checks to cash from a trust account. If Samuel had done this, he would have violated Md. Rule 16-609, and correspondingly 1.15(a).

[18] Maryland Rule 16-760(d)(3) prohibited Jonathan, as a suspended attorney, from writing checks on the trust account. Because this Rule is not in the MLRPC it is not relevant to Samuel's liability for Jonathan's conduct under 5.3(c)(2).

Firm in violation of this proscription. 5.3(d) does not define "law-related activity," and the hearing judge observed that this Court has never addressed the term.

5.3(d) was added in 2006 in connection with amendments to then-Rule 16-760.[19] At that time, Md. Rule 16-760(d)(2), although not in effect, prohibited suspended or disbarred attorneys from working as paralegals. We asked the Rules Committee ("Committee") to draft a Maryland Rule permitting formerly admitted lawyers to work as paralegals subject to a reporting requirement and supervision by a lawyer. *See* Minutes, Standing Comm. on Rules of Practice & Procedure 2 (Oct. 14, 2005).

The Committee eliminated Md. Rule 16-760(d)(2) and sent the Court a draft of 5.3(d). This draft was substantially similar to Rule 217(j) of the Pennsylvania Rules of Disciplinary Enforcement. Unlike Rule 217(j), the Committee did not include a list of permissible activities. Rather, they considered that a formerly admitted lawyer should be allowed to "engage in the same law-related activities as any other nonlawyer, subject to the conditions and restrictions set forth in the Rule[.]" Letter from Chairperson Joseph F. Murphy, Jr. to the Court of Appeals 7–8 (Dec. 16, 2005).

5.3(d)(3) is not intended to prohibit formerly admitted lawyers from engaging in law-related activities. *See* MLRPC 5.3(d)(1)(A). But 5.3(d)(2)(G) specifically prohibits **any** law-related activities by formerly admitted lawyers in a law firm or for a lawyer with whom they were associated at the time of disbarment or suspension. The Pennsylvania Rule shares this limitation, *see* Pa. R. D. E. 217(j)(4)(i), although the Note clarifies that it

---

[19] This Rule has since been renumbered and amended as Md. Rule 19-742.

is not intended "to prohibit a formerly admitted attorney from performing services that are not unique to law offices such as . . . equipment maintenance, courier or delivery services, catering, typing or transcription or other similar general office support activities." *Id.* Under 5.3(d), the Firm could employ Jonathan—provided he did not engage in law-related activities.

The hearing judge found that accessing Google Earth internet files was not a law-related activity because it is not legal research, requires no legal knowledge, or specialized skill. He considered it to be "basic litigation support" unrelated to legal research. We agree—finding Google Earth images is closer to a general office support activity.

Catzen testified that Jonathan used his computer after his suspension "in the normal course of business." Catzen identified files that had been created, modified, or accessed from Jonathan's computer during the relevant time frame, but not all of them related to legal activities. The hearing judge considered that this was not clear and convincing evidence that Jonathan's computer was used in law-related activities because Catzen never demonstrated what, if anything, Jonathan did to those files. We agree.

Other documents on Jonathan's computer, including interrogatories and letters to the clerk, were only scanned and then converted to word processing documents. Jonathan then provided the files to attorneys to draft responses. We consider that this activity is consistent with permissible general office support.

The more complicated questions arise from two other activities—whether sending the Hill e-mail and making deposits to or disbursements from the trust account are law-related activities within the meaning of 5.3(d)(3).

44

Because Pa. R. D. E. 217(j) served as a model for 5.3(d)(3), we consider it useful in answering these questions. Pa. R. D. E. 217(j) identifies permissible law-related activities by a formerly admitted attorney. Subsection (3) permits a formerly admitted attorney to directly communicate with a client or third party:

> regarding a **matter** being handled by the attorney, organization or firm for which the formerly admitted attorney works **only if** the communication is limited to **ministerial matters** such as **scheduling, billing, updates, confirmation of receipt or sending of correspondence and messages**. The formerly admitted attorney **shall clearly indicate** in any such communication that he or she is a legal assistant and identify the supervising attorney.

*Id.* (emphasis added). The hearing judge determined that corresponding with clients is a necessary step to gather the information to answer interrogatories and such correspondence is a legal activity. The Hill e-mail was a direct communication with a client regarding a matter that the Firm was handling. The e-mail updated Hill that the Firm had received interrogatories and requested her to contact the Firm. We consider that this e-mail is ministerial in nature. Jonathan did not discuss Hill's matter and he testified that he sent the e-mail at the direction of an attorney. The Hill e-mail is clerical work common to administrative assistants—regardless of whether or not they work in a law firm. As such, we do not conclude that this is a law-related activity under 5.3(d)(2)(G).

Non-lawyers are permitted to handle financial matters for a law firm if an attorney provides reasonable supervision and ensures that their conduct complies with the attorney's professional obligations. *Cf. Glenn*, 341 Md. at 478 (attorney could delegate bookkeeping responsibilities to nonlawyer assistants with adequate supervision). Still, a supervisory

45

attorney must take "reasonable steps" to prevent a formerly admitted lawyer from "receiv[ing] funds from or on behalf of a client or disburs[ing] funds to or on behalf of a client[.]" MLRPC 5.3(d)(2)(F).

Jonathan, as a suspended attorney, was prohibited from receiving or disbursing client funds. Jonathan wrote the checks to transfer "fees that had been received by the [F]irm" to the operating account from the trust account. This counts as disbursing client funds, and Jonathan's actions therefore are inconsistent with 5.3(d)(2)(F). We do not analyze, as the hearing judge did, whether it was a "law-related activity" under Rule 5.3(d)(2)(G).

That Jonathan wrote checks is not sufficient to find that Samuel violated 5.3(d)(2)(F). The question is whether Samuel failed to take reasonable steps to prevent Jonathan's activities. We determine that Samuel violated 5.3(d)(2)(F) for the same reasons he violated 5.3(b)—he did not adequately supervise Jonathan or make reasonable efforts to prevent him from writing checks.[20] *See supra.*

Finally, Rule 5.3(d)(3) requires a supervising lawyer and a formerly admitted attorney to file a notice of employment and written employment agreement with Bar Counsel within 30 days after the employment has commenced. Samuel and Jonathan did not comply with this requirement. *See infra.* Therefore, Samuel and Jonathan violated 5.3(d)(3).

---

[20] The hearing judge also concluded that Jonathan violated 5.3(d)(2)(G). But 5.3(d)(2) sets out several obligations for a **supervising** lawyer, not the suspended lawyer. For this reason, Jonathan could not have violated 5.3 (d)(2)(G).

## MLRPC 5.4(a) and (d)(1)

5.4(a) prohibits a lawyer or a law firm from sharing legal fees with nonlawyers, except in limited circumstances. Bar Counsel excepts to the hearing judge's conclusion that Samuel did not violate 5.4(a), claiming that Samuel "permitted Leonard to pay himself from the trust account, including funds for legal services Leonard performed following his suspension."

To find a violation of this rule, we require evidence showing that the attorney shared fees with a nonlawyer in an impermissible arrangement. *See Attorney Grievance Comm'n v. Chapman*, 430 Md. 238, 269 (2013) (lawyer violated 5.4(a) by forming consulting arrangement with capital firm wherein clients would sign law firm retainer, capital firm would handle the loan modification and the firms would split the fees); *Attorney Grievance Comm'n v. Brennan*, 350 Md. 489, 493–94, 501 (1998) (lawyer violated 5.4(a) when he split a $1,500 fee for legal services with a suspended lawyer he ostensibly employed as a paralegal).

Evidence generally relating to compensation from a firm is usually insufficient to find a 5.4(a) violation without information proving that the compensation related to a fee-sharing arrangement. *See Barton*, 442 Md. at 138 (no 5.4(a) violation when employee's tax forms showed a higher salary from the law firm than the lawyer testified employee received, but there was no evidence attributing the salary to fee sharing). Our review of the record reveals limited information about the Firm's compensation structure. Samuel described some of the checks Leonard wrote to him after his suspension as "disbursements

of fees." He said the clients were "firm clients," and they could have been represented by himself, Babest, or Loewenthal. There is no evidence that Leonard shared those fees.

Bar Counsel's primary support for the claim that Samuel impermissibly shared fees with Leonard is a spreadsheet summary of information Leonard provided to Gilliss about the status of client matters at the time the TRO went into effect, and the assertion that Leonard took attorneys' fees in eight of the matters on the spreadsheet. The spreadsheet lists clients, identifies the date of the client's accident, settlement amounts, liens, and whether attorneys' fees were taken. It does not identify when settlements took place, which attorney represented the client, or who received fees.[21] We agree with the hearing judge that this is not clear and convincing evidence that Samuel violated 5.4(a) and overrule Bar Counsel's exception.

5.4(d)(1) prohibits attorneys from "practic[ing] with or in the form of a professional corporation or association authorized to practice law for a profit, if . . . a nonlawyer owns any interest therein." Leonard was the sole shareholder of the Firm. Samuel was employed at the Firm. He continued practicing there after Leonard's suspension. He did not form the LLC until over seven months after Leonard's suspension. Thus, Samuel violated

---

[21] Bar Counsel relies on *In re Tanella*, 104 A.D.3d 94, 96–97 (N.Y. App. Div. 2013). There, Tanella entered into an agreement with Professional Billing Services, a business owned by two nonlawyers. They assumed control over the operations of Tanella's law practice and shared his attorney's fees. *Tanella* is doubtful precedent to support Bar Counsel's claims because there is no evidence that Samuel and Leonard had such an arrangement. Leonard carried on the Firm the same way he had before his suspension, which included managing the Firm's finances.

5.4(d)(1) by continuing to practice in a professional corporation owned by a suspended attorney.

## MLRPC 5.5(a)

5.5(a) prohibits an attorney from practicing law in a jurisdiction "in violation of the regulation of the legal profession in that jurisdiction or assist[ing] another in doing so." Bar Counsel excepts to the hearing judge's conclusion that Samuel did not violate 5.5(a) because Leonard was engaged in the unauthorized practice of law, and Samuel assisted him "by giving him unfettered access to his attorney trust account, the office and the client files as well as allowing Leonard to use his name to advance the perception that [the Firm] was a legally permissible law firm."

Leonard ran the Firm after his suspension and settled cases. Settling cases is the practice of law. *See Attorney Grievance Comm'n v. Ambe*, 425 Md. 98, 129 (2012). Engaging in the practice of law during a suspension violates 5.5(a). *See Attorney Grievance Comm'n v. Maignan*, 423 Md. 191, 203 (2011). Our analysis however, turns on whether Samuel assisted Leonard in this conduct.

Attorneys violate this rule when they knowingly collaborate with suspended or disbarred attorneys and permit or assist their continued practice. *See Attorney Grievance Comm'n v. Bocchino*, 435 Md. 505, 535 (2013) (attorney violated 5.5(a) by permitting a disbarred attorney to draft and file documents under his name without reviewing documents, and did not enter into separate retainer agreement with disbarred attorney's clients); *Brennan*, 350 Md. at 500–01 (attorney violated 5.5(a) when he knew clients would

perceive suspended attorney as an actual attorney, never signed a separate retainer agreement, or corrected clients' perception).

Bar Counsel relies on *Smith*, 443 Md. at 368–69, in which we concluded an attorney had violated 5.5(a) by regularly delegating authority to his nonlawyer assistant to "send demand letters to insurance companies, settle claims, and provide legal advice to clients without supervision . . . ." Samuel did not employ Leonard or agree to supervise him after his suspension. Samuel testified that he had only observed Leonard engaging in clerical or administrative activities after his suspension and had not observed him negotiating settlements. He also testified that he had not asked or authorized Leonard to settle any cases that he worked on or disburse funds. Bar Counsel has not offered any evidence demonstrating that Samuel delegated tasks to Leonard. Samuel's status as Leonard's employee, without more, is not sufficient for a violation of this Rule. There was no clear and convincing evidence that Samuel violated 5.5(a). We overrule Bar Counsel's exception.

The hearing judge determined that Bar Counsel did not offer clear and convincing evidence that Jonathan engaged in the practice of law after his suspension, or that Samuel assisted him in such activities. Bar Counsel has not excepted to this conclusion. For reasons discussed *infra*, we agree with the hearing judge that Jonathan did not engage in the unauthorized practice of law. Therefore, Samuel did not violate 5.5(a) as applied to Jonathan.

50

## MLRPC 8.1(a)

8.1(a) prohibits an attorney "in connection with a disciplinary matter" from "knowingly making a false statement of material fact." Bar Counsel charged Samuel with multiple violations of this Rule relating to his May 2014 affidavit and his March 2015 statement under oath. The hearing judge found that Samuel had not made any misrepresentations. Bar Counsel excepts to five instances.[22] To find a violation of 8.1(a), "Bar Counsel is required to prove with clear and convincing evidence that [a] respondent's supposed false statements were made with the knowledge that such statements were false when he made them." *Attorney Grievance Comm'n v. Mooney*, 359 Md. 56, 78 (2000).

### *The May 2014 Affidavit*

1. Samuel stated that he was unaware of Jonathan receiving client funds or making disbursements of client funds.

Bar Counsel argues that we should infer Samuel's knowledge of Jonathan's check-writing activities because Samuel was the only licensed attorney signatory, and had he reviewed the Firm's financial records, he would have discovered that Jonathan was writing checks. Alternatively, Bar Counsel suggests that Samuel's failure to do due diligence before making his affidavit is "so reckless that it supports a reasonable inference that Samuel knew his statement was false."

Samuel learned in June 2014 that Jonathan was writing checks. Bar Counsel failed to prove by clear and convincing evidence that Samuel knew this statement was false when

---

[22] Bar Counsel's Exceptions refer to six instances, but only identify five statements. Presumably the sixth is Samuel's statement that he did not have managerial authority, which we determined, *supra*, was an accurate assessment of matters at the Firm.

he signed the affidavit. That Samuel should have known Jonathan was writing checks does not transform a negligent statement into an intentional misrepresentation. *See Mooney*, 359 Md. at 78 ("[D]eceit and misrepresentation in a disciplinary action must be found to be intentional."). Statements made without specific knowledge, although careless and ill-advised, do not satisfy this criterion. We overrule Bar Counsel's exception.

2. Samuel stated that Jonathan signed the 5.3 Agreement on July 10, 2013.

Samuel's statement was obviously incorrect. The 5.3 Agreement was submitted to Bar Counsel in January 2014. Samuel admitted in his April 2017 deposition that he had incorrectly identified the date and acknowledged his error again at trial. Judge Stringer was in the best position to assess Samuel's credibility and weigh the evidence. *See Attorney Grievance Comm'n v. Ward*, 394 Md. 1, 27 (2006). He found that this erroneous statement was not an **intentional** misrepresentation. Bar Counsel had always known that Jonathan had not submitted his 5.3 Agreement within 30 days, and Jonathan's 16-781(d) statement explained that the Agreement was effective July 10, 2013. Bar Counsel's exception is overruled.

3. Samuel stated that he had not delegated any legal tasks or law-related activity to Leonard.

Bar Counsel asserts that Samuel "delegated his obligations to safekeep client and third party funds and to create and maintain records associated with his attorney trust account to Leonard." But the record shows that Leonard always managed the Firm's finances. Samuel abdicated his affirmative duty to safeguard his client funds. But that does not prove that he delegated any responsibilities to Leonard. Bar Counsel has not

identified any evidence supporting this allegation and failed to prove it by clear and convincing evidence. We overrule this exception.

4. Samuel did not have managerial authority.

Bar Counsel excepted to the hearing judge's factual finding on this assertion. For the reasons discussed, *supra*, we conclude that this statement was not a misrepresentation and overrule any exception.

5. Jonathan did not draft legal documents.

Bar Counsel has not excepted to the hearing judge's conclusion that this was not a misrepresentation. Babest and Loewenthal, two witnesses the hearing judge found extremely credible, described Jonathan's post-suspension conduct. None of the attorneys in the Firm asked Jonathan to draft pleadings, discovery, or conduct legal research. Catzen's analysis did not demonstrate what Jonathan did to any of the files on the Firm's server. We agree that this is not clear and convincing evidence proving that Jonathan drafted legal documents.

6. The term "paralegal" in the 5.3 Agreement did not include drafting pleadings, discovery, doing legal research, or communicating with clients.

Bar Counsel did not except to this conclusion. There is no evidence in the record showing that Samuel and Jonathan had a different intention in using the word. We agree there is insufficient evidence to find that this was an intentional misrepresentation.

7. Samuel was not responsible for supervising Leonard.

For the reasons set forth in our discussion of Samuel's authority in the Firm, *supra*, we conclude that this statement was not a misrepresentation.

53

1. "Samuel knowingly and intentionally testified falsely that Leonard was only involved in clerical and/or administrative matters following his suspension."

Bar Counsel excepts, asserting that at the time Samuel made his statement under oath, he knew that Leonard had settled cases and made disbursements after his suspension. The hearing judge found that this allegation "does not accurately state Samuel's testimony." A review of the transcript confirms Judge Stringer's assessment.

> **[Bar Counsel]:** What did you **observe** Leonard doing when he was in the office following his suspension in September of 2013?
>
> **[Samuel]:** Clerical matters, administrative.
>
> **[Bar Counsel]:** Like what?
>
> **[Samuel]:** Checking mail, files, putting things into files that needed to be in files. That's what I observed.
>
> **[Bar Counsel]:** Nothing else?
>
> **[Samuel]:** That's what I **observed**. I didn't observe more. That's correct.

(Emphasis added). Bar Counsel is correct that Samuel knew the scope of Leonard's post-suspension activities in March 2015. But Bar Counsel did not ask what Samuel **knew** at the time, only what he **observed** Leonard doing. She has not offered any evidence that proves Samuel made a knowing and intentional misrepresentation in describing his observations. We overrule this exception.

2. "Samuel . . . testified falsely during his statement under oath on March 30, 2015 that he learned, for the first time, in August 2014, that Leonard had settled cases while suspended."

Bar Counsel excepts, contending that based on the circumstances, Samuel "necessarily knew" that Leonard was settling client matters, because he should have known someone else was writing checks. In June 2014, Samuel e-mailed McCabe about a conversation with Leonard during which he had told Leonard that an attorney needed to handle settlements. Thus, she reasons, Samuel's statement was a knowing and intentional misrepresentation.

During the March 2015 statement, Bar Counsel asked whether Samuel had learned that Leonard was negotiating settlements after his suspension. Samuel testified that "[a]fter everything turned over in August there were apparently cases that had been settled that he—he settled them." Bar Counsel asked if Samuel had learned this for the first time in August, and Samuel agreed.

The June 2014 e-mail to McCabe states:

> I explained that all settlements needed to be handled by myself or an attorney (or in theory a paralegal working under supervision of an attorney as is done at many firms) and he agreed. We worked out parameters for how to do that essentially making sure that I am available to make the calls and to take the calls. I am currently working through a box of files.

Samuel explained to McCabe that he initiated the conversation after realizing that there were serious managerial and operational issues after a discussion with McCabe. The hearing judge concluded that the e-mail was not an intentional misrepresentation, but a "2 month discrepancy[.]" We defer to his assessment of witness credibility, particularly because he saw Samuel testify for nearly a day and a half. *Ward*, 394 Md. at 27. The e-mail may "suggest" that Samuel knew, however, suggestion is not sufficient for the actual

55

knowledge required for a misrepresentation. *See Mooney*, 359 Md. at 78. Although this is a closer call, we conclude that the hearing judge did not err, and overrule Bar Counsel's exception.

The hearing judge found that Samuel did not make misrepresentations when he stated that Jonathan did not draft interrogatories or pleadings after his suspension and that he could not recognize Leonard's or Jonathan's handwriting. Bar Counsel has not excepted to these findings. We have already concluded that Jonathan did not draft legal documents. We agree with the hearing judge that there is no evidence proving that Samuel feigned an inability to recognize the handwriting.

We overrule all of Bar Counsel's exceptions regarding 8.1(a). There is not clear and convincing evidence that Samuel made knowing and intentional misrepresentations during the disciplinary investigation and proceedings. Therefore, he did not violate 8.1(a).

### MLRPC 8.1(b)

8.1(b) provides that an attorney in connection with a disciplinary matter shall not "fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority . . . ." Bar Counsel asserted that Samuel violated this Rule in two ways. First, he "intentionally obstructed" the investigation during his

March 2015 statement when he testified that he did not know, or could not recall, certain material facts.

Attorneys violate 8.1(b) by knowingly failing to respond to Bar Counsel's requests for information, such as letters, calls, or requests for documents.[23] A review of the record shows that Samuel answered Bar Counsel's questions. His answers may not have been satisfactory to Bar Counsel, but that is not sufficient to find a knowing failure to respond. The hearing judge found that this was a "chaotic" time and observed that several witnesses at trial had trouble recalling details. We agree that without evidence showing that Samuel did recall, or entirely refused to answer, his statements that he could not recall specific details are not sufficient to find a knowing failure to respond in violation of 8.1(b). *Cf. Attorney Grievance Comm'n v. Bellamy*, 453 Md. 377, 403 (2017) (attorney violated 8.1(b) by refusing to respond to Bar Counsel's inquiries, and when asked to disclose her banking institution, told Bar Counsel's investigator to figure it out).

Second, Bar Counsel alleged that Samuel and Jonathan violated 8.1(b) by failing and refusing to provide evidence about the date the 5.3 Agreement was created. This is based on three contentions: (1) after the June 2015 ransomware attack, Samuel intentionally failed to ensure that metadata was preserved; (2) Respondents intentionally concealed the date the 5.3 Agreement was created by back-dating the agreement; and (3)

---

[23] *See, e.g.*, *Attorney Grievance Comm'n v. McLaughlin*, 456 Md. 172, 199–200 (2017); *Attorney Grievance Comm'n v. Johnson*, 450 Md. 621, 646 (2016); *Attorney Grievance Comm'n v. Steinberg*, 395 Md. 337, 354–55 (2006).

Respondents fabricated claims of attorney-client privilege to conceal the date the agreement was created.[24]

The hearing judge found that Samuel did not ask Spiegelman to limit, delete, or omit information, only to restore his files as soon as possible. Catzen had testified that the metadata was not restored because the technician chose not to but admitted that he did not know if metadata was enabled in the Firm's word processing program, and that it is not unusual to see legal documents without metadata.

The 5.3 Agreement itself, although backdated, was not an attempt to conceal information. Bar Counsel was aware when Hesselbacher submitted the document that it was tardy—indeed, the record shows that a paralegal at the AGC alerted Hesselbacher to the lapse. Respondents admitted at trial that the Agreement was drafted in November or December 2013 because they, like Hesselbacher, had overlooked the requirement. The 5.3 Agreement was described as having an "effective" date of July 10, 2013, and Leonard's name is not on the letterhead, although he was still active as of that date.

Respondents' counsel asserted privilege over metadata in the copy of the 5.3 Agreement they had because it was the one Jonathan had used to communicate with Hesselbacher. Hesselbacher did not draft the agreement, but it was not unreasonable for Respondents' counsel to proceed with caution when dealing with potentially privileged

---

[24] This allegation was not charged in the Petition, although the hearing judge made findings of fact and conclusions of law regarding the issue as it related to Bar Counsel's claims that the Respondents were attempting to conceal the date that the 5.3 Agreement was created.

materials. Ultimately, Respondents' counsel provided the last modified date to Bar Counsel and agreed to let Catzen look at the file. They also provided access to the Firm's server and Jonathan's computer.[25]

The hearing judge found that these incidents did not supply sufficient evidence to prove that Respondents fabricated evidence to obstruct Bar Counsel's investigation. Bar Counsel has not excepted. We defer to the hearing judge's findings of fact on this question, and agree, for the same reasons, that Bar Counsel has not shown by clear and convincing evidence that Respondents' conduct violated 8.1(b).

## MLRPC 8.4

Bar Counsel asserts that should we sustain her exceptions to the hearing judge's findings regarding 5.3 and 8.1(a), then we should find that Samuel violated 8.4(b) and (c) by assisting Leonard's criminal conduct,[26] and by committing perjury in violation of Maryland Code (2002, 2012 Repl. Vol.), § 9-101 of the Criminal Law ("CR") Article in both his May 2014 affidavit and March 2015 statement.

---

[25] Samuel complied with the subpoena Bar Counsel sent asking for access to the Firm's file server. Samuel explained that it had "copious amounts of personal health information of clients, of other information that was relevant to him, could have criminal record information of somebody charged with a crime, all kinds of information that we felt duty bound to protect." The server also had a directory that Jonathan used to communicate with counsel, which might contain privileged information. We observe that 8.1(b) permits an attorney not to disclose "information otherwise protected by 1.6," which addresses confidentiality of information. We do not consider that Respondents erred by ensuring that any agreement with Bar Counsel and its investigators would appropriately protect client information or preserve attorney-client privilege.

[26] Specifically, Maryland Code (2002, 2012 Repl. Vol.), §§ 7-104 (General Theft Provisions) and 7-113 (Embezzlement—Fraudulent Misrepresentation by Fiduciaries) of the Criminal Law ("CR") Article.

59

8.4(b) provides that "it is professional misconduct for a lawyer to . . . commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." To find a violation of 8.4(b), we must find "clear and convincing evidence of conduct that would violate a criminal statute." *Attorney Grievance Comm'n v. Agbaje*, 438 Md. 695, 729 (2014). We then consider whether that conduct reflects negatively on the attorney's "honesty, trustworthiness, or fitness as a lawyer in other respects." *Id.* at 729–30. 8.4(c) states that an attorney commits professional misconduct by engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation."

Bar Counsel also asserted that Samuel made knowing and intentional misrepresentations to SDAT by stating that he had not controlled the Firm's finances. A review of the record, however, demonstrates that Leonard managed the Firm's finances after his suspension. *See supra*. This, as Judge Stringer observed, "was the crux of the problem with the trust account[.]" We agree. Samuel did not control the Firm's financial decisions—indeed, he shirked his 1.15(a) responsibility to safeguard client funds. We have overruled Bar Counsel's exceptions to 8.1(a) and 5.3. Therefore, we overrule this exception and find that Samuel did not violate 8.4(b) and (c).

8.4(d) prohibits an attorney from engaging in "conduct that is prejudicial to the administration of justice." An attorney violates this rule when his or her conduct negatively impacts "the public's perception or efficacy of the courts or legal profession." *Attorney Grievance Comm'n v. Rand*, 411 Md. 83, 96 (2009). Relying on *Smith* and *Zuckerman*,

60

and cases from other jurisdictions,[27] Bar Counsel contends that regardless of our conclusion on her other exceptions, Samuel violated this Rule by failing to properly manage the trust account.

In *Smith*, 443 Md. at 377, Smith comingled client and personal funds, permitted an overdraft, failed to keep adequate records of disbursement, and violated 1.15(d). He also abandoned his practice to a nonlawyer assistant who misappropriated substantial amounts of money and engaged in the unauthorized practice of law. Smith failed to communicate with clients, appear on their behalf, and respond to litigation documents. *Id.* at 377–78. In *Zuckerman*, 386 Md. at 374, Zuckerman neglected his trust account, commingled client funds, and failed to pay clients and medical providers for an extended period of time.

Other cases finding 8.4(d) violations for mishandling trust accounts in violation of 1.15(a) similarly involve more severe Rule violations. *See, e.g.*, *Attorney Grievance Comm'n v. Mahone*, 451 Md. 25, 43 (2016) (attorney overdrew trust account, used funds for unauthorized purposes, failed to create and maintain records, and comingled funds); *Mungin*, 439 Md. at 315 (attorney was out of trust for nine client matters, failed to account and disburse funds, invaded other clients' trust monies, and did not promptly pay providers); *Attorney Grievance Comm'n v. Carithers*, 421 Md. 28, 56 (2011) (attorney did

---

[27] The other cases Bar Counsel relies on to support the exception that Samuel violated this Rule are unpersuasive because the attorneys in those cases were not charged with, or found to have committed, violations of the other jurisdiction's equivalent of 8.4(d). *See Matter of Kwiatkowski*, 275 A.D.2d 141, 143–44 (N.Y. App. Div. 2000) (attorney violated New York rule prohibiting conduct "adversely reflecting on . . . fitness to practice law"); *Cleveland Metro. Bar Ass'n v. Zoller & Mamone*, 41 N.E.3d 407, 411 (Ohio 2015) (violations of 1.15 equivalent).

not maintain a trust account, comingled and misappropriated funds); *Attorney Grievance Comm'n v. Maignan*, 390 Md. 287, 296–97 (2005) (attorney did not maintain a trust account and comingled funds).

Although Samuel neglected his 1.15(a) obligations, which in turn, led to his failure to supervise Jonathan, we think his violation was less severe than *Smith* or *Zuckerman*. He did not have exclusive control over the account, and Bar Counsel has not shown that Samuel was responsible for the overdrafts. We overrule Bar Counsel's exception.

An attorney violates 8.4(a) by breaching other Rules of Professional Conduct. *Attorney Grievance Comm'n v. McLaughlin*, 456 Md. 172, 200 (2017). Because Samuel violated MLRPC 1.15(a), 5.3(b), (d)(2)(F), and (d)(3), and 5.4(d)(1), we conclude that he has violated 8.4(a).

### *Jonathan*

### MLRPC 1.1, 1.2, 1.3, 1.4, 1.5, and 1.16

We agree with the hearing judge's conclusion that Jonathan did not violate MLRPC 1.1, 1.2, 1.3, 1.4, 1.5, and 1.16 in his representation of Jeter. Jonathan had two lengthy in-person meetings with Jeter to discuss her case. He also maintained telephone contact with her throughout the matter. He contacted the nursing program staff to investigate her claims. *See, e.g.*, *Attorney Grievance Comm'n v. Dyer*, 453 Md. 585, 662 (2017) (attorneys did not violate rule of professional conduct regarding diligence when they sought to expeditiously move the underlying litigation forward). After investigating, he concluded that Jeter had no reasonable basis to contest her expulsion from the nursing program. Although Jeter complained that Jonathan abandoned her case, she lacked a viable case. *C.f.*, *Attorney*

62

*Grievance Comm'n v. Smith*, 457 Md. 159, 216 (2018) ("When an attorney does nothing whatsoever to advance the client's cause or endeavor, . . . the attorney violates MLRPC 1.3.") (cleaned up). The hearing judge determined that Jonathan called Jeter to inform her of the disposition of her case, and we defer to his resolution of that factual question. *See* Md. Rule 19-741(b)(2)(A).

### MLRPC 5.3(d)(3)

The hearing judge determined that Jonathan violated 5.3(d)(3) through his failure to timely submit his 5.3 Agreement to Bar Counsel. Jonathan resumed employment at the Firm on July 10, 2013. According to 5.3(d)(3), Jonathan and Samuel were required to submit notice of his employment at the Firm within 30 days after commencement of the employment. Hesselbacher did not send the employment contract to Bar Counsel until January 2014, after learning from a paralegal with Bar Counsel's office that they had overlooked the requirement. This violated 5.3(d)(3), as the hearing judge rightfully found.[28] *See In re Perrone*, 899 A.2d 1108, 1116 & n.10 (Pa. 2006) (formerly admitted attorney violated Pa. R. D. E. 217(j) by failing to notify the Pennsylvania disciplinary authority of his work as an independent contractor for a law office after suspension); *see also* Letter from Chairperson Joseph F. Murphy, *supra*, at 1 (Pa. R. D. E. 217(j) is source rule for MLRPC 5.3(d)(3)).

---

[28] Jonathan did not except to the hearing judge's conclusion that he violated 5.3(d)(3).

## Md. Rule 19-609(b)

Md. Rule 16-609(b) states that "[a]n instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer . . . ." The Rule further provides that "[a]ll disbursements from an attorney trust account shall be made by check or electronic transfer." *Id.* Jonathan admits that he wrote checks from the Firm's trust account to "cash" in violation of this Rule. Accordingly, Jonathan violated Md. Rule 16-609(b).

## MLRPC 8.1(a)

The hearing judge concluded that Jonathan violated 8.1(a) when, despite Jonathan's averments to the contrary in his Rule 16-781(g) affidavit, he failed to comply with Rule 16-760(c)(11) and (d)(3) by delaying notice of his employment and writing checks on the attorney trust account. The hearing judge also found that Jonathan's affidavit to Bar Counsel misrepresented the frequency with which Jonathan wrote checks from the Firm's trust account following his suspension. Bar Counsel alleges that Jonathan made further misrepresentations in his reinstatement efforts, specifically, in his assertion that he did not give legal advice to clients and that he did not perform legal services for the Firm.

8.1(a) provides that an applicant for reinstatement to the Bar shall not "knowingly make a false statement of material fact . . . ." 8.1(b) states that an applicant shall not "fail to disclose a fact necessary to correct a misapprehension known by the [applicant] to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority . . . ."

In his Rule 16-781(g) affidavit, submitted with his tardy 5.3 Agreement, Jonathan stated: "I certify that **I have complied with the requirements of Rule 16-760**, including

64

notifying clients, withdrawing from client matters, providing the required information and documentation to Bar Counsel and the Attorney Grievance Commission, and notifying directories." (Emphasis added). Rule 16-760(c) lists specific obligations for suspended attorneys. Subsection (11) required Jonathan to comply with 5.3. We determined, *supra*, that Jonathan violated this Rule because he submitted his 5.3 Agreement after the 30-day deadline. The question we now face is whether Jonathan's statement in his Rule 16-781(g) affidavit—that he had complied with Md. Rule 16-760—was a material misrepresentation in violation of 8.1.

"A violation of MLRPC 8.1(a) will result whenever an attorney makes intentional misrepresentations to Bar Counsel." *Attorney Grievance Comm'n v. Mitchell*, 445 Md. 241, 259 (2015). In *Attorney Grievance Comm'n v. Nussbaum*, 401 Md. 612, 641 (2007), we concluded that an attorney violated 8.1(a) after he submitted ledgers purporting to be contemporaneously maintained with his escrow account transactions to Bar Counsel. The ledgers were actually made after the fact. *Id.*; *see also Attorney Grievance Comm'n v. Lee*, 393 Md. 385, 411–13 (2006) (attorney violated 8.1(a) after attributing a delay in a client's case to the unavailability of transcripts when the attorney's failure to timely review the case materials caused the delay).

Jonathan knew that he failed to submit his 5.3 Agreement to Bar Counsel in a timely manner. Yet Jonathan still asserted his compliance with the Rules. Although Jonathan submitted documentation regarding his late 5.3 Agreement, he still technically made a misrepresentation because he had violated Md. Rule 16-760(c)(11) and then asserted compliance with the same.

The hearing judge also concluded that Jonathan made a misrepresentation in his affidavit because he had violated Md. Rule 16-760(d)(3) by writing checks against the Firm's trust account after his suspension. Maryland Rule 16-760(d)(3) prohibits a formerly admitted attorney from using "any stationery, bank account, checks, or labels on which the respondent's name appears as an attorney or in connection with any office for the practice of law . . . ." Hesselbacher provided Jonathan with a copy of Md. Rule 16-760 within days of his suspension. Yet, in October, November, and December of 2013, Jonathan wrote approximately 25 checks on the Firm's attorney trust account. Even though he received a copy of Md. Rule 16-760, and knew it prohibited writing checks in connection with the Firm, Jonathan still represented to Bar Counsel that he had complied with Md. Rule 16-760. This rendered his affidavit asserting compliance with Md. Rule 16-760 a misrepresentation in violation of 8.1(a).

Bar Counsel argues that Jonathan made further misrepresentations in his Rule 16-781(g) affidavit because he "engaged in the practice of law" or "attempted to engage in the unauthorized practice of law" during his suspension. Bar Counsel would have us conclude that Jonathan was practicing law when he sent the Hill e-mail. The e-mail stated:

> This is Jonathan Sperling from Leonard J. Sperling's office. As part of the lawsuit the office filed on your behalf, we must answer interrogatories. The interrogatories are a series of written questions that are filed by each party as an information gathering tool. Please call the office . . . so that we can answer the questions together.

Bar Counsel cites only *Barton*, 442 Md. at 140, for the proposition that Jonathan's e-mail constitutes legal advice and is therefore the unauthorized practice of law. In that

case, we concluded that a lawyer violated the MLRPC after a nonlawyer assistant led several clients to believe he was a lawyer and gave legal advice to several clients. *Id.* at 140. The nonlawyer assistant's actions amounted to the practice of law, and his "supervising" attorney was sanctioned accordingly. *Id.* at 149. We must determine whether sending the Hill e-mail constituted the practice of law. If it did, Jonathan committed another violation of 8.1(a).

"What constitutes the practice of law is a determination that, ultimately, this Court makes . . . ." *Attorney Grievance Comm'n v. Shaw*, 354 Md. 636, 648 (1999). The General Assembly has provided guidance regarding what constitutes the practice of law in Maryland Code (1989, 2010 Repl. Vol.), § 10-101(h) of the Business Occupations & Professions Article:

> (h)(1) **Practice law** — "Practice law" means to engage in any of the following activities:
>     (i) giving legal advice;
>     (ii) representing another person before a unit of the State government or of a political subdivision; or
>     (iii) performing any other service that the Court of Appeals defines as practicing law.
> (2) "Practice law" includes:
>     (i) advising in the administration of probate of estates of decedents in an orphans' court of the State;
>     (ii) preparing an instrument that affects title to real estate;
>     (iii) preparing or helping in the preparation of any form or document that is filed in a court or affects a case that is or may be filed in a court; or
>     (iv) giving advice about a case that is or may be filed in a court.

The practice of law includes "[u]tilizing legal education, training, and experience . . . [to apply] the special analysis of the profession to a client's problem."

*Kennedy v. Bar Ass'n of Montgomery Cty., Inc.*, 316 Md. 646, 662 (1989). "Where trial work is not involved but the preparation of legal documents, their interpretation, the giving of legal advice, or the application of legal principles to problems of any complexity, is involved, these activities are still the practice of law." *Lukas v. Bar Ass'n of Montgomery Cty., Inc.*, 35 Md. App. 442, 448, *cert. denied*, 280 Md. 733 (1977). Importantly though, "practice of law [is] a term of art connoting much more than merely working with legally-related matters." *In re Application of Mark W.*, 303 Md. 1, 19 (1985). The focus of our inquiry is, "whether the activity in question required legal knowledge and skill in order to apply legal principles and precedent." *In re Discipio*, 645 N.E.2d 906, 910 (Ill. 1994).

In *Kennedy*, we concluded that an attorney licensed in another state, but unlicensed in Maryland, engaged in the unauthorized practice of law when he "set up his principal office for the practice of law in Maryland and began advising clients and preparing legal documents for them from that office . . . ." 316 Md. at 663. Reaching a different result, in *Mark W.*, 303 Md. at 19, we determined that an out-of-state attorney who worked as a hearing examiner in Maryland for a state agency, did not practice law. The Court explained that these activities were in a "very narrow, specialized field," and that the work "involved no clients, public or private." *Id.*

As to Jonathan, we think it unfair to say that merely sending the Hill e-mail constitutes the practice of law. If we were to hold so, almost any paralegal, law clerk, or administrative staffer would undoubtedly have engaged in the practice of law at some point. Bar Counsel has not proven, by clear and convincing evidence, that Jonathan, during his suspension, filed any papers in court or advised clients regarding legal issues in their

68

cases. A singular e-mail to a client that defines the term interrogatories and directs her to call the office's main phone number does not constitute the practice of law. Accordingly, Jonathan's statement that he had not engaged in the practice of law was truthful and not a misrepresentation.

Jonathan also signed another affidavit in connection with his petition for readmission to the Bar. In that affidavit, he said:

> 1. I am one of several individuals with signature authority on the escrow account of The Sperling Law Office, P.C. I have signed checks drawn on that account on a limited number of occasions. I have never had any significant responsibility with respect to managing that account.
>
> 2. On **several occasions**, when one of the other signatories on the account was not available, I was asked to write checks from the escrow account for payment of fees the law firm had earned. . . .

Jonathan used the word "several" with reference to the fact that there were three signatories on the account—and that he had written over 80 checks on the Firm's escrow account. His statement that he wrote checks "on several occasions" misrepresented the number of times he had written checks on the escrow account. Surely, his use of the word "several" was intended to obfuscate the true number of checks he wrote from the account. We conclude that this statement was also a misrepresentation and a violation of 8.1(a).

On March 11, 2014, Hesselbacher sent an e-mail to Bar Counsel, with Jonathan's express authorization, listing the tasks Jonathan performed at the Firm after his suspension in his capacity as a paralegal. With Jonathan's approval, Hesselbacher represented to Bar Counsel that Jonathan performed the following tasks at the law office:

69

- Managing supplies and equipment including the BGE accounts[;]
- Office supplies – purchasing, servicing and ordering[;]
- Computer maintenance – servicing all the computers[;]
- Copier maintenance – repairing and maintaining all the office copiers[;]
- Periodically answering the phones[;]
- Arranging for closed files to be picked up[;]
- Installing computer systems and programs on the computer when needed[;]
- Repairing the phone systems when there is an issue[;]
- Photocopying when needed[;]
- Plumbing repairs on occasion[.]

Jonathan did not mention that he made numerous deposits into and disbursements from the Firm's trust account. By failing to disclose these additional activities to Bar Counsel, Jonathan made yet another misrepresentation and violated 8.1(a).

Bar Counsel contends that the hearing judge erred by failing to find that Jonathan made further misrepresentations in a letter submitted to Bar Counsel on December 5, 2014. At the outset, we emphasize that this letter was signed by Jonathan's **attorneys**, not Jonathan himself. Unlike other documents, Bar Counsel did not establish a foundation regarding Jonathan's approval of the letter, or any representation he made to his attorneys. Bar Counsel takes issue with only one sentence in the seven-page letter: "Further, since his suspension, Jonathan has not engaged in the practice of law, attempted to engage in the unauthorized practice of law, and has not engaged in any other sort of professional misconduct."

Bar Counsel contends that Jonathan engaged in the unauthorized practice of law yet represented otherwise in the letter. For the same reasons discussed, *supra* we conclude that

70

Jonathan did not engage in the unauthorized practice of law. Bar Counsel further argues that the statement in the letter was a misrepresentation because Jonathan had committed misconduct, namely, making misrepresentations to Bar Counsel, failing to file a timely notice of employment according to 5.3(d)(3), and using a bank account and checks for the practice of law in violation of Md. Rule 16-760(d)(3).

The letter, however, was not a sworn statement from Jonathan. Jonathan's attorneys advocated on their client's behalf. They made numerous arguments as to why Jonathan had not committed misconduct. The letter closes with the sentence Bar Counsel objects to, by concluding—rightly—that Jonathan did not engage in the practice of law. They further argued—less rightly—that Jonathan had not committed misconduct. While Jonathan's attorneys were ultimately wrong in their assertion that Jonathan had not committed misconduct, we decline to hold that an attorney's statement, made merely in the course of advocating on behalf of his client, caused his **client** to violate 8.1(a).[29]

### MLRPC 8.1(b)

Bar Counsel alleged in the Petition that Jonathan "knowingly and intentionally testified falsely that he was unable to recall material facts in an effort to obstruct Bar

---

[29] The hearing judge concluded that Jonathan misrepresented that he provided his login credentials for his computer to all the attorneys in the office, including Michele Loewenthal and Andrea Babest, and they used his credentials to log on to his computer. Bar Counsel did not charge Jonathan with an additional violation of 8.1 based on this testimony. Accordingly, we cannot conclude that Jonathan's statements violated the MLRPC. *See Attorney Grievance Comm'n v. Cherry-Mahoi*, 388 Md. 124, 153–54 (2005) (sustaining exception to hearing judge's conclusion that an attorney made a misrepresentation in an Answer to a Petition for Disciplinary or Remedial Action, because "no allegation was made, nor could be made, in the Petition, that the [attorney's] Answer to that Petition was misleading.").

Counsel's investigation." The hearing judge did not conclude that Jonathan violated 8.1(b). Bar Counsel did not except to this conclusion. Upon our independent review of the record, we conclude that Bar Counsel has not presented clear and convincing evidence that Jonathan obstructed the investigation by knowingly and intentionally testifying falsely or claiming an inability to recall material facts. Bar Counsel also contended that Jonathan violated 8.1(b) by backdating his employment agreement with Samuel. For the reasons discussed *supra*, in our analysis of whether Samuel violated 8.1(b), we conclude that Jonathan did not violate 8.1(b).

### MLRPC 8.4(b)

Bar Counsel alleged that Jonathan committed perjury as defined in CR § 9-101, and accordingly charged that Jonathan violated Rule 8.4(b). But Bar Counsel failed to articulate in the Amended Petition what facts supported this charge. We have previously held that charges must be "sufficiently clear and specific so as to make the attorney aware of what he [or she] is compelled to answer for and defend against." *Bar Ass'n of Baltimore City v. Cockrell*, 270 Md. 686, 692 (1974); *see also Attorney Grievance Comm'n v. Fezell*, 361 Md. 234, 247 (2000) ("To be sufficient, a petition must be intelligible and sufficiently informative to allow an accused attorney to prepare a defense."). **After** the close of the evidentiary hearing, Bar Counsel submitted Proposed Findings of Fact and Conclusions of Law, which stated that Jonathan committed perjury in his Rule 16-781(g) affidavit when "he falsely stated that he had 'not engaged in the practice of law or attempted or offered to engage in the unauthorized practice of law['] and that he had 'not engaged in any other sort of professional misconduct' since his suspension." The hearing judge considered and

72

rejected this theory, finding that "Petitioner failed to prove that Jonathan had engaged in the practice of law or attempted to engage in the unauthorized practice of law . . . ." In light of Petitioner's failure to "prove a number of its allegations," the hearing judge also rejected the general charge that "Respondent's conduct, taken as a whole . . ." constitutes a violation of Rule 8.4(d).

Consistent with the hearing judge's findings, we hold that under these circumstances, Bar Counsel's allegation in the Amended Petition, in the form of a footnote, was not sufficiently informative to make Jonathan aware of what allegedly constituted perjury. Accordingly, we hold that Jonathan did not violate 8.4(b).

### MLRPC 8.4(c)

8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation . . . ." Jonathan violated 8.1(a) by making misrepresentations to Bar Counsel in connection with his efforts to be reinstated. Attorneys who engage in dishonest or deceitful conduct violate 8.4(c). *See e.g.*, *Attorney Grievance Comm'n v. Smith*, 425 Md. 230, 235 (2012) (attorney violated 8.4(c) by submitting false documents in support of an application to practice law in the District of Columbia). We agree with the hearing judge and conclude that by making false statements to Bar Counsel and to this Court, Jonathan violated 8.4(c).

### MLRPC 8.4(d)

It is misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice . . . ." MLRPC 8.4(d). Bar Counsel excepts to the hearing judge's

finding that Jonathan did not violate 8.4(d) and argues that Jonathan's conduct "taken as a whole . . . certainly brings the legal profession into disrepute in violation of Rule 8.4(d)."

Bar Counsel relies only on *Attorney Grievance Comm'n v. Page*, 430 Md. 602 (2013), for the proposition that knowing and intentional dishonest conduct in reinstatement proceedings violates 8.4(d). In *Page*, a suspended attorney continued to practice law yet, while seeking reinstatement, represented to Bar Counsel and this Court that he had complied with the terms of his suspension. *Id.* at 633–34. We concluded that these statements violated 8.1 but ruled that additional misrepresentations, related to a client's tax matter, violated 8.4(d). *Id.* at 631–32. *Page* does not mandate that misrepresentations in reinstatement proceedings, by themselves, are conduct prejudicial to the administration of justice.

Although we did not go so far in *Page*, we have recognized that an attorney violates 8.4(d) by being dishonest with Bar Counsel in connection with a disciplinary matter. *See Attorney Grievance Comm'n v. Thomas*, 445 Md. 379, 396 (2015); *Attorney Grievance Comm'n v. Brigerman*, 441 Md. 23, 40–41 (2014). In *Thomas*, an attorney violated a Conditional Discipline Agreement with Bar Counsel, yet maintained that he had refrained from using drugs and alcohol. 445 Md. at 396. Thomas also failed to disclose that he had been discharged from a substance abuse program after failing to attend required counseling sessions. *Id.* We concluded that by making misrepresentations to preserve his Conditional Discipline Agreement and thus his right to practice law, Thomas's conduct was prejudicial to the administration of justice because "no reasonable member of the public" would expect an attorney to engage in such behavior. *Id.*

74

Although Jonathan's misrepresentations are not quite as severe as the attorney's in *Thomas*, he still vastly understated the number of checks he handled in connection with the Firm's trust account. He also made the less substantial misrepresentation that he had complied with 5.3(d)(3). A reasonable member of the public would not expect Jonathan to make misrepresentations to Bar Counsel to be reinstated. Therefore, Jonathan's conduct was prejudicial to the administration of justice and violated 8.4(d).

### MLRPC 8.4(a)

8.4(a) provides that it is professional misconduct for a lawyer to "violate or attempt to violate the [MLRPC], knowingly assist or induce another to do so, or do so through the acts of another . . . ." Jonathan violated 5.3(d)(3), 8.1(a), (c), and (d). Accordingly, Jonathan has also violated 8.4(a). *See McLaughlin*, 456 Md. at 200.

### The Settlement "Agreement"

Jonathan argues that the hearing judge improperly concluded that no settlement agreement existed between him and Bar Counsel. Jonathan met with his lawyer and Bar Counsel in 2015. At this meeting, Bar Counsel and Jonathan agreed, orally, to resolve "any and all outstanding potential disciplinary actions [against Jonathan]." This purported agreement was never reduced to writing. Jonathan argues that Bar Counsel repeatedly acknowledged the existence of the settlement agreement, represented that Bar Counsel would send a draft of the agreement, but never sent the draft.

A review of the correspondence following the 2015 meeting however, reveals that both Bar Counsel and Jonathan's lawyer refer to only a "proposed" or "draft" agreement that still required Jonathan's approval. Bar Counsel repeatedly said she would draft a Joint

Petition for Indefinite Suspension yet failed to do so.  At best, this was an oversight.  At worst, it was misleading for Bar Counsel to imply that a joint petition would be forthcoming.  This does not change that Jonathan and Bar Counsel never finalized or submitted a joint petition or received this Court's approval.  Upon our independent review of the record, we agree with the hearing judge that the parties had not entered into a settlement agreement regarding disciplinary actions against Jonathan.

## Sanctions For Violations of the MLRPC

Upon review of the record, we hold that Samuel violated MLRPC 1.15(a), 5.3(b), (d)(2)(F), and (d)(3), 5.4(d)(1), and 8.4(a), and that Jonathan violated MLRPC 5.3(d)(3), 8.1(a), 8.4(a), (c), and (d), and Md. Rule 16-609(b).

We impose sanctions on attorneys not as punishment, but "to protect the public and the public's confidence in the legal profession . . . [and] to deter other lawyers from violating the Rules of Professional Conduct." *Attorney Grievance Comm'n v. Taylor*, 405 Md. 697, 720 (2008).  Sanctions should be "commensurate with the nature of the gravity of the misconduct and the intent with which it was committed." *Id.*  Thus, a sanction "depends upon the facts and circumstances of the cases, taking account of any particular aggravating or mitigating factors." *Id.*  "[T]his Court considers '(a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors.'" *Attorney Grievance Comm'n v. McDowell*, 439 Md. 26, 45 (2014) (quoting American Bar Association, *Standards for Imposing Lawyer Sanctions* at III.C.3.0 (1992)).

### *Aggravating Factors*

We have recognized the following aggravating factors:

> (1) prior attorney discipline; (2) a dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple violations of the MLRPC; (5) bad faith obstruction of the attorney discipline proceeding by intentionally failing to comply with the Maryland Rules or orders of this Court or the hearing judge; (6) submission of false evidence, false statements, or other deceptive practices during the attorney discipline proceeding; (7) a refusal to acknowledge the misconduct's wrongful nature; (8) the victim's vulnerability; (9) substantial experience in the practice of law; (10) indifference to making restitution or rectifying the misconduct's consequences; (11) illegal conduct, including that involving the use of controlled substances; and (12) likelihood of repetition of the misconduct.

*McLaughlin*, 456 Md. at 204 (cleaned up).

### *Samuel*

The hearing judge found that none of the aggravating factors applied to Samuel. Bar Counsel excepts, asserting that factors 2, 3, 4, 5, 6, 7, 9, 10, and 11 apply. We have overruled Bar Counsel's exceptions regarding misrepresentations and dishonest conduct. For that reason, we overrule her exceptions to factors 2, 5, 6, and 11. The hearing judge was in the best position to assess factors 7 and 10. Although Samuel did not offer restitution to Leonard's victims, he assumed some Firm expenses, assisted Firm clients, and reduced his fees on some occasions. We overrule Bar Counsel's exceptions.

Factor 3, a pattern of misconduct, applies when an attorney's behavior shows a pattern of inappropriate conduct, as evinced by multiple violations over time, or a series of acts with one goal. *See, e.g.*, *Attorney Grievance Comm'n v. Coppola*, 419 Md. 370, 406 (2011); *Attorney Grievance Comm'n v. Mininsohn*, 380 Md. 536, 572 (2004). Here,

Samuel's misconduct stems not from a pattern of acts, but inattentiveness. Factor 3 is not present.

We sustain two of Bar Counsel's exceptions. Because Samuel violated 1.15(a), 5.3(b), (d)(2)(F), and (d)(3), 5.4(d)(1), and 8.4(a), factor 4 is present. Samuel was admitted to the Maryland Bar in 1996 and had approximately 16 to 17 years' experience in the practice of law. Our other cases indicate that this is sufficient to find factor 9. *See Coppola*, 419 Md. at 406–07. This finding, however, is tempered by Samuel's inexperience in firm management and the difficulty he faced in enforcing his father's separation from the law firm Leonard built and controlled.

*Jonathan*

Jonathan has prior disciplinary offenses, having been indefinitely suspended on July 5, 2013. *See Attorney Grievance Comm'n v. Sperling*, 432 Md. 471 (2013). Therefore, factor 1 is present. Jonathan excepts to the hearing judge's finding of factor 2, maintaining that he did not act with a selfish or dishonest motive. Although Jonathan may not have acted with a "selfish" motive—indeed he did not benefit from any of his misconduct—Jonathan made a substantial misrepresentation in failing to disclose the number of checks he had deposited or withdrawn. Jonathan's extensive communications with Bar Counsel regarding his efforts to be reinstated, and misrepresentations in documents submitted to this Court do not diminish the dishonesty attributable to the misrepresentations in those communications. We overrule Jonathan's exception and conclude that he acted with a dishonest motive. Accordingly, factor 2 is present.

Jonathan committed multiple violations of the MLRPC. Factor 4 is therefore present. Because Jonathan submitted false statements to Bar Counsel during his efforts to attain reinstatement, factor 6 is present. Turning to factor 7, Jonathan excepts, asserting that he has acknowledged the wrongfulness of his conduct because he admitted that writing checks during his suspension was improper. But Jonathan has refused to acknowledge that his misrepresentations to Bar Counsel in discussing his check-writing activities were wrongful. Thus, factor 7 is present. Jonathan, having been admitted to the Bar in 1998, has substantial experience in the practice of law. Hence, factor 9 is present.

### *Mitigating Factors*

Mitigating factors include:

> Mitigating factors include: (1) the absence of prior attorney discipline; (2) the absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith efforts to make restitution or to rectify the misconduct's consequences; (5) full and free disclosure to the Commission or a cooperative attitude toward the attorney discipline proceeding; (6) inexperience in the practice of law; (7) character or reputation; (8) a physical disability; (9) a mental disability or chemical dependency, including alcoholism or drug abuse, where: (a) there is medical evidence that the lawyer is affected by a chemical dependency or mental disability; (b) the chemical dependency or mental disability caused the misconduct; (c) the lawyer's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (d) the recovery arrested the misconduct, and the misconduct's recurrence is unlikely; (10) delay in the attorney discipline proceeding; (11) the imposition of other penalties or sanctions; (12) remorse; (13) remoteness of prior violations of the MLRPC; and (14) unlikelihood of repetition of the misconduct.

*Attorney Grievance Comm'n v. Shuler*, 443 Md. 494, 507 (2015) (cleaned up).

The parties dispute whether *Attorney Grievance Comm'n v. Pennington*, 387 Md. 565, 590 (2005), which prohibits good faith reliance on advice of counsel as a defense to violations of the MLRPC, permits such reliance as mitigation. In *Pennington*, we concluded that Pennington could not use her consultation with an attorney as mitigation because the attorney was not admitted in Maryland, and because her consultation sought ratification for unethical conduct, rather than "an objective and reliable ethics opinion . . . ." *Id.* at 598. But we did not explicitly foreclose that as a mitigating factor. *See id.* at 595. As such, we conclude that the hearing judge did not err in considering Respondents' retention of experienced ethics counsel as mitigation.

Bar Counsel further excepts to the hearing judge's mitigation findings for Respondents, arguing that the facts are not mitigation that this Court has recognized. We disagree. The facts found by the hearing judge are within the realm of permissible mitigating factors. *See Shuler*, 443 Md. at 507.

### *Samuel*

Samuel has no prior disciplinary history. He did not misappropriate funds, or personally profit from Leonard or Jonathan's activities and did not engage in dishonest conduct. Upon receipt of Bar Counsel's initial correspondence, Samuel promptly retained McCabe, an experienced ethics attorney, to assist him in responding to Bar Counsel. Samuel responded to Bar Counsel's requests for information, furnished requested documents, granted access to the Firm's server, and participated in multiple depositions. He spent significant time working with Gilliss to identify victims of Leonard's misconduct, obtain compensation for the Firm's clients, and reduced his fees in some cases. Regarding

the circumstances during which the misconduct took place, the hearing judge considered that it was "chaotic," and Samuel worked with Babest and Loewenthal to keep the Firm going, despite Leonard's retaining control of the Firm even after he was suspended. The hearing judge found that Samuel was remorseful.

Samuel has a positive reputation in his community and volunteers with various charitable organizations. He serves on the Board of his synagogue and devotes substantial time on Board activities. He also has performed free legal services for members of the congregation. Samuel also attends a Baltimore congregation, to achieve the necessary quorum to hold prayer services, and provides them with free legal services. The hearing judge favorably considered the testimony of Rabbi David Herman, who testified that Samuel was a "mensch,"[30] who "treats people with respect and sensitivity," and who had always been truthful with him. Rabbi Binyamin Marwick submitted a letter attesting to Samuel's good character.

*Jonathan*

Jonathan served as the president of his synagogue for seven and a half years. He regularly meets with the rabbi, supervises all activities, including "raising money for charity, religious events[,] and hearing about problems from the congregants." He spends 16 to 20 hours weekly on this work. He also volunteers with "an organization that provides and delivers meals to the poor." Jonathan also "visits with the sick in hospitals and

---

[30] Mensch is a "Yiddish term meaning conscientious, compassionate, caring and responsible . . . ."

participates in the Northwest Citizen Patrol." In addition, he volunteers at his son's school and raises money for the school.

Jonathan testified that his life has been an "emotional hell" since the Firm's implosion and that he has received counseling with a therapist and his rabbi to "right [himself]." Jonathan also has a positive reputation in his community. He submitted a character letter from Loewenthal describing him as a "man of honesty and integrity" who has performed "many hours of community service within the synagogue and in the service of the community." Consistent with the mitigation discussed for Samuel, *supra*, Jonathan's retention of skilled ethics counsel to assist him, not in defending against charges, but in his compliance with the Rules, is also a mitigating factor, in the sense that it shows a cooperative attitude toward an attorney discipline proceeding. Jonathan did not misappropriate funds or personally profit from his check-writing activity. The hearing judge also found that Jonathan cooperated with Gilliss and "expressed remorse for the [F]irm's clients who suffered losses as a result of Leonard's misappropriation of money."

### *Samuel: Violations of MLRPC 1.15(a), 5.3(b), (d)(2)(F), and (d)(3), 5.4(d)(1), and 8.4(a)*

Bar Counsel argues that Samuel's conduct is akin to that of the attorneys in *Smith* and *Gracey*, and merits disbarment. We disagree. Both of those attorneys engaged in far more severe misconduct than has been found in this case. *Smith*, 443 Md. at 388–89 (disbarment appropriate for "inexcusable" neglect causing substantial harm to clients and attorney had notice of misconduct of nonlawyer assistant); *Gracey*, 448 Md. 1, 27 (2016) (disbarment warranted when attorney participated in employees' scheme to defraud bank,

82

took clients' money without authorization, provided false statements, and altered documents to Bar Counsel).

In other cases in which an attorney violated 1.15(a), but did not intentionally misappropriate client funds, we have imposed a range of sanctions. *See, e.g.*, *Attorney Grievance Comm'n v. Obi*, 393 Md. 643, 658 (2006) (30-day suspension); *Attorney Grievance Comm'n v. Sperling*, 380 Md. 180, 192–93 (2004) (indefinite suspension with right to reapply after 90 days); *Attorney Grievance Comm'n v. Adams*, 349 Md. 86, 98–99 (1998) (30-day suspension).

Samuel's misconduct was not intentional; rather it was the product of inattention to his obligations. Samuel neglected his affirmative duties to safeguard clients' funds. His employer, a suspended attorney, misappropriated substantial sums of money. As a result, three of Samuel's clients were directed to the Client Protection Fund. This inattention directly related to his failure to supervise Jonathan's activities in writing checks.

In *Zuckerman*, 386 Md. at 379, we considered an indefinite suspension with the right to reapply after 30 days appropriate when an attorney improperly managed his trust account, comingled client funds, and allowed money to accumulate that should have been paid to third parties. Zuckerman's inattention and failure to supervise permitted an employee to misappropriate funds. *Id.* Samuel's case is closer to *Zuckerman* than it is to *Smith* or *Gracey*. Although Zuckerman discovered his employee's misappropriation more quickly, Samuel was not directly responsible for supervising Leonard and lacked managerial authority in the Firm. Further, there is no evidence that Samuel's failure to supervise Jonathan contributed to Leonard's misappropriation. Samuel cooperated with

Bar Counsel's investigation, demonstrated remorse, and presented substantial mitigation. He has no prior disciplinary history. Under these circumstances, we consider that a 90-day suspension from the practice of law is the appropriate sanction.

### *Jonathan: Violations of MLRPC 5.3(d)(3), 8.1(a), 8.4(a), (c), and (d), and Md. Rule 16-609(b).*

"[W]hen an attorney's misconduct is characterized by 'repeated material misrepresentations that constitute a pattern of deceitful conduct, as opposed to an isolated instance,' disbarment follows as a matter of course." *Attorney Grievance Comm'n v. Framm*, 449 Md. 620, 667 (2016) (quoting *Attorney Grievance Comm'n v. Lane*, 367 Md. 633, 647 (2002)). In *Framm*, the respondent attorney failed to communicate effectively with clients, lied to a client to conceal misconduct, and lied to and deceived the court to the detriment of a former client and for her own monetary gain. *Id.* at 667–68. In *Attorney Grievance Comm'n v. Lane*, 367 Md. 633, 647 (2002), we ordered disbarment of another lawyer who engaged "in a pattern of deceitful and lying conduct designed to conceal his lack of diligence."

Yet in other cases involving intentional misrepresentations, we have ordered only an indefinite suspension. In *Lee*, 393 Md. at 412–13, we indefinitely suspended a lawyer who made misrepresentations to Bar Counsel regarding the lawyer's inactivity in a client's matter. Lee misrepresented the cause of delay in a client's post-conviction case when it was attributable to Lee's failure to personally review the file for two years. *Id.* at 412–13. We ordered an indefinite suspension in similar cases involving misrepresentation to Bar Counsel. *See Attorney Grievance Comm'n v. Granger*, 374 Md. 438, 461–62 (2003)

(indefinite suspension with right to reapply no sooner than six months warranted after attorney neglected client matters and made misrepresentations to Bar Counsel); *Attorney Grievance Comm'n v. Cohen*, 361 Md. 161, 171–79 (2000) (indefinite suspension with a right to reapply no sooner than six months warranted following attorney's neglect of a client's matter and false representations to Bar Counsel regarding the refund status of unearned fees).

According to Bar Counsel, Jonathan's misrepresentations are part of a pattern of deceitful conduct akin to the lawyers in *Framm* and *Lane*. But in those cases, the attorneys made repeated misrepresentations about a variety of matters, to both clients and Bar Counsel. Here, although we do not understate the significance of Jonathan's misrepresentations, he made a total of three false statements to Bar Counsel. He misrepresented his compliance with 5.3(d), misrepresented compliance with Md. Rule 16-760, and understated the number of checks he had deposited or withdrawn from the trust account. These misrepresentations were serious, but Jonathan's conduct is a far cry from *Framm* and *Lane*, and closer to *Lee*, *Cohen*, and *Granger*. Accordingly, we shall order his continued indefinite suspension. This suspension, and the underlying conduct, will be considered adversely, **in addition** to the previous suspension and underlying conduct, if Jonathan seeks reinstatement.

# COSTS

Md. Rule 19-709[31] empowers this Court to award costs to the prevailing party in an attorney

discipline proceeding. Relatedly, Md. Rule 19-728(b)(3) permits any party to file a

statement of costs to which that party may be entitled under Md. Rule 19-709. Under Md.

Rule 19-728(c) an adverse party is permitted to file a response to a statement of costs within

---

[31] Md. Rule 19-709 provides:

> (a) **Generally**. Except as provided in section (c) of this Rule, and unless the Court of Appeals orders otherwise, the prevailing party in proceedings under this Chapter is entitled to reasonable and necessary costs. By order, the Court may allocate costs among the parties.
>
> (b) **Costs Defined**. Costs include:
>> (1) court costs;
>> (2) reasonable and necessary fees and expenses paid to an expert witness who testified in the proceeding before the circuit court judge;
>> (3) reasonable and necessary travel expenses of a witness who is not an expert witness;
>> (4) reasonable and necessary costs of a transcript of proceedings before the circuit court judge;
>> (5) reasonable and necessary fees and expenses paid to a court reporter or reporting service for attendance at a deposition and for preparing a transcript, audio recording, or audio-video recording of the deposition; and
>> (6) other reasonable and necessary expenses, excluding attorneys' fees, incurred in investigating the claims and in prosecuting or defending against the petition for disciplinary or remedial action before the circuit court judge and in the Court of Appeals.
>
> ***
>
> (d) **Judgment**. Costs of proceedings under this Chapter, including the costs of all transcripts, shall be assessed by the Clerk of the Court of Appeals and included in the order as a judgment. On motion, the Court may review the action of the Clerk.

15 days. Here, Respondents and Bar Counsel each filed a timely statement of costs pursuant to Md. Rule 19-709. The AGC submitted a statement of costs totaling $37,270.45. Respondents' costs total $26,568.48. Both except to each other's costs.

Respondents contend that Md. Rule 19-709 only entitles the "prevailing" party to costs. Because Bar Counsel did not prove all charges brought against Jonathan and Samuel, Respondents reason we should not assess costs attributable to the claims that Bar Counsel did not prove against them. Also, Respondents object to Bar Counsel's costs relating to Gilliss because he testified as a fact witness, not as an expert.

This Court has yet to define "prevailing party" as it is used in Md. Rule 19-709. In *Attorney Grievance Comm'n v. Dyer*, 453 Md. 585, 683 n.19 (2017), we elected not to award costs to Bar Counsel even though Bar Counsel succeeded in proving one charge of misconduct warranting a reprimand:

> Although we reprimand Mr. Dyer, as indicated in the mandate, we do not assess the costs against him; rather, we assess the costs against the Commission. We note that Bar Counsel brought numerous charges against Mr. Dyer, and, upon our independent review, we conclude that Dyer has engaged in misconduct involving only one violation of the MLRPC, MLRPC 8.1(b), for which he is hereby reprimanded. Only a fraction of costs of the attorney discipline proceeding can be attributed to the charged violation of MLRPC 8.1(b). We conclude that, **under these circumstances, ordering costs against Mr. Dyer is inequitable**. Even having Mr. Dyer and the Commission split the costs would not be equitable given that a large portion of the costs are due to alleged violations of the MLRPC that were not sustained and that the Commission failed to prove are supported by clear and convincing evidence. And, as determined above, none of the charged violations against Ms. Gray were proven with clear and convincing evidence. Accordingly, we shall assess the costs against the Commission.

87

*Id.* (emphasis added). *Dyer* demonstrates that equitable considerations animate our decision to award costs in attorney discipline matters, but it does not offer a clear analytic path to resolving who is the prevailing party.

Cases from this Court have addressed prevailing party status in other contexts. In *Friolo v. Frankel*, 373 Md. 501, 522–25 (2003), although we did not consider whether the plaintiff was a prevailing party, in analyzing the method of calculating attorneys' fees under fee-shifting statutes in the Labor and Employment Article, we imported the prevailing party analysis in *Hensley v. Eckerhart*, 461 U.S. 424, 433–37 (1983). From *Hensley*, we drew the principle that a party may prevail if the party succeeds on any significant issue that achieves some of the benefit sought in bringing the action. *Friolo*, 373 Md. at 523 (citing *Hensley*, 461 U.S. at 433).

The claimant need not win all claims to be regarded as "prevailing." *Id.* Assigning fees is a matter of judicial discretion, and involves tailoring the fee to the results obtained, a process analogous with determining equitable remedies. *See id.* at 524–25. Shifting financial responsibility to a non-prevailing party must be in accordance with the underlying policy of the statute or rule authorizing the imposition of fees. *Id.* at 517–18; *see also Armstrong v. Baltimore*, 409 Md. 648, 685, 692–93 (2009) (although claimants did not receive the relief sought, they succeeded in proving a statutory violation and were entitled to an award of costs).

"The primary purpose of attorney discipline is the protection of the public, not the punishment of the attorney." *Attorney Grievance Comm'n v. Whitehead*, 390 Md. 663, 674

(2006). Maryland Rule 19-709(a) states: "[U]nless the **Court of Appeals orders otherwise**, the prevailing party in proceedings under this Chapter is entitled to **reasonable and necessary** costs." (Emphasis added). Ultimately, the determination of who is a prevailing party will depend on this Court's "determination in terms of an assessment," on a case-by-case basis. Minutes, Standing Comm. on Rules of Practice & Procedure 48 (Nov. 21, 2014). Bar Counsel need not prove all, or even a majority, of the allegations levied against an attorney to be considered a "prevailing party." Md. Rule 19-709 provides this Court with wide discretion when awarding costs, particularly when an award might be inequitable. *See Dyer*, 453 Md. at 683 n.19.

Bar Counsel proved several violations by Respondents, and under these circumstances is entitled to a costs award. But we do not just rubberstamp every cost that Bar Counsel claims. *See* Md. Rule 19-709(a). We decline to award the following costs to Bar Counsel:[32]

- $16,970.45 in consulting fees from Catzen to analyze the computer files from the Firm, and another $1,270.90 for Catzen's video deposition and transcript. The monies expended on Catzen resulted in **no finding** of misconduct against either Respondent. As such, we conclude that these costs were not reasonable and necessary.

---

[32] Bar Counsel submitted invoices for the cost of transcribing the evidentiary hearing before Judge Stringer, but the costs of these transcripts are not included in the total of costs submitted to this Court. We do not assess this cost against Bar Counsel or Respondents.

- $4,655.00 for Gilliss's time spent corresponding with Bar Counsel and testifying. Gilliss was not an expert witness. Md. Rule 19-709(b)(2) permits the payment of reasonable and necessary costs related to expert witnesses but makes no such allowance for the payment of fact witness like Gilliss.[33] *See id.* (b)(3).

- $6,940.00 for the retrieval and printing of the Firm's bank records from Wells Fargo Bank. At trial, McCabe testified that Samuel had already provided the bank records after Bar Counsel served him with a subpoena. Samuel acquired these records from the bank and then forwarded them to Bar Counsel. Bar Counsel had no need—that they have explained—to acquire a **second** copy of these bank records at a substantial cost. We conclude that this cost was not "reasonable and necessary."

## CONCLUSION

We hold that Samuel violated MLRPC 1.15(a), 5.3(b), (d)(2)(F), (d)(3), 5.4(d)(1), and 8.4(a), and suspend him from the practice of law for 90 days. We hold that Jonathan violated MLRPC 5.3(d)(3), 8.1(a), 8.4(a), (c), and (d), and Md. Rule 16-609(b), and continue his indefinite suspension. Consistent with our discussion above, we assess costs against Respondents, but in the reduced amount of $7,434.10.

**IT IS SO ORDERED.**

---

[33] Prevailing parties may recover only "reasonable and necessary travel expenses of a witness who is not an expert witness . . . ." Md. Rule 19-709(b)(3)

Circuit Court for Baltimore County
Case No. 03-C-16-010146
Argued: March 5, 2018

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG Nos. 40 and 76

September Term, 2016

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

SAMUEL SPERLING AND JONATHAN
DANIEL SPERLING

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Concurring and Dissenting Opinion by Watts,
J., which Greene, J., joins.

_____

Filed: May 21, 2018

Respectfully, I concur in part and dissent in part. I join the Majority's conclusions as to the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") that Samuel Sperling ("Samuel"), Respondent, violated. See Maj. Slip Op. at 90. I also agree with the Majority that the appropriate sanction for Samuel's misconduct is a ninety-day suspension from the practice of law in Maryland. See id. I join the Majority's conclusions as to the MLRPC that Jonathan Sperling ("Jonathan"), Respondent, violated. See id. I disagree, however, that the appropriate sanction for Jonathan's misconduct is to continue his existing indefinite suspension from the practice of law in Maryland. See id. at 85, 90. In my view, Jonathan's serious misconduct, the many aggravating factors, and the existence of an indefinite suspension warrant disbarment.

Jonathan violated MLRPC 8.1(a) (Disciplinary Matters) and 8.4(c) (Dishonesty, Fraud, Deceit, or Misrepresentation) by falsely averring in an affidavit regarding his actions as a suspended lawyer that he had complied with Maryland Rule 16-760, and by misrepresenting the number of checks that he had written on the Sperling Law Office's attorney trust account after he was suspended. See Maj. Slip Op. at 64-66, 69, 73. Jonathan committed this misconduct while already indefinitely suspended from the practice of law in Maryland; he has presented no compelling extenuating circumstances, as required under Attorney Grievance Comm'n v. Vanderlinde, 364 Md. 376, 413, 773 A.2d 463, 485 (2001); and his misconduct is exacerbated by multiple aggravating factors.

There is no justification for imposing a sanction of indefinite suspension when Jonathan was already indefinitely suspended from the practice of law at the time that he committed the dishonest conduct in this case. In imposing a second indefinite suspension,

the Majority attempts to distinguish between degrees of dishonest conduct, and concludes that Jonathan's dishonest conduct was not severe enough to warrant disbarment. See Maj. Slip Op. at 85 ("According to Bar Counsel, Jonathan's misrepresentations are part of a pattern of deceitful conduct akin to the lawyers in [Attorney Grievance Comm'n v. Framm, 449 Md. 620, 144 A.3d 827 (2016)] and [Attorney Grievance Comm'n v. Lane, 367 Md. 633, 790 A.2d 621 (2002)]. But in those cases, the attorneys made repeated misrepresentations about a variety of matters, to both clients and Bar Counsel."). This Court has stated, time and time again, that, where dishonest conduct is involved, the Court will not engage in such an inquiry. In Vanderlinde, 364 Md. at 418, 773 A.2d at 488, we stated:

> [W]e will not in the future attempt to distinguish between degrees of intentional dishonesty based upon convictions, testimonials or other factors. Unlike matters relating to competency, diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse. Honesty and dishonesty are, or are not, present in an attorney's character.

See also Attorney Grievance Comm'n v. Smith, 457 Md. 159, 223, 177 A.3d 640, 678 (2018) (same) (quoting Vanderlinde, 364 Md. at 418, 773 A.2d at 488).

And, the Majority compares Jonathan's conduct to that of the respondents in Attorney Grievance Comm'n v. Lee, 393 Md. 385, 903 A.2d 360 (2006), Attorney Grievance Comm'n v. Cohen, 361 Md. 161, 760 A.2d 706 (2000), and Attorney Grievance Comm'n v. Granger, 374 Md. 438, 823 A.2d 611 (2003). The Majority states: "The[] misrepresentations were serious, but Jonathan's conduct is a far cry from *Framm* and *Lane*, and closer to *Lee*, *Cohen*, and *Granger*." Maj. Slip Op. at 85. In Lee, Cohen and Granger,

however, the respondents were not already indefinitely suspended from the practice of law when the Court imposed the sanction of indefinite suspension.

Here, Jonathan's misconduct is aggravated by numerous factors. First, Jonathan has received prior attorney discipline, in the form of an indefinite suspension. See Attorney Grievance Comm'n v. Sperling, 432 Md. 471, 498, 69 A.3d 478, 494 (2013). Second and third, the hearing judge found that Jonathan had a dishonest or selfish motive and engaged in submission of false evidence, false statements, or other deceptive practices during this attorney discipline proceeding. The hearing judge found that, by falsely averring that he had complied with Maryland Rule 16-760; by falsely testifying that other lawyers in the Sperling Law Office used his credentials to log onto his computer; and by misleadingly stating that he had written checks on the Sperling Law Office's attorney trust account "on several occasions[,]" "Jonathan made multiple misrepresentations with a motive to hide or understate the extent of his activities after his suspension." Fourth, given that Jonathan violated MLRPC 8.4(c) both here and in Sperling, id. at 494, 69 A.3d at 491, Jonathan has engaged in a pattern of misconduct. Fifth, Jonathan committed multiple violations of the MLRPC. Sixth, Jonathan has refused to acknowledge his misconduct's wrongful nature; the hearing judge found: "Jonathan admitted to the wrongful nature of writing checks to cash on the attorney trust account and writing checks on the attorney trust account while suspended, but he has not acknowledged his misrepresentations." Seventh, Jonathan had substantial experience in the practice of law.

I would conclude that the appropriate sanction for Jonathan's misconduct is disbarment. Chief among other misconduct, Jonathan violated MLRPC 8.1(a) and 8.4(c)

by falsely stating in an affidavit concerning his actions as a suspended lawyer that he had complied with Maryland Rule 16-760, and by misrepresenting the number of checks that he had written on the Sperling Law Office's attorney trust account after he was suspended. "[D]isbarment ordinarily should be the sanction for intentional dishonest conduct, absent compelling extenuating circumstances[.]" Attorney Grievance Comm'n v. McLaughlin, 456 Md. 172, 206, 171 A.3d 1205, 1225 (2017) (cleaned up). Here, Jonathan does not allege that there are any compelling extenuating circumstances, and I discern none.

Even if there were any doubt that Jonathan's misconduct merits disbarment, such doubt would be eliminated by the seven aggravating factors. Chief among those are the circumstances that, less than five years ago, this Court indefinitely suspended Jonathan from the practice of law, see Sperling, 432 Md. at 498, 69 A.3d at 494, and this Court has not reinstated Jonathan to the practice of law in Maryland. Significantly, in Sperling, id. at 494, 69 A.3d at 491, this Court concluded that Jonathan violated MLRPC 8.4(c) because he "both misrepresented facts to the court in an effort to mislead the court into granting [] motions to reopen and lied to his client regarding the status of her case." Given that Jonathan has continued to engage in dishonesty, disbarment is necessary to protect the public. Just as in Attorney Grievance Comm'n v. Ross D. Hecht, No. 97, Sept. Term, 2016, ___ Md. ___, ___ A.3d ___, 2018 WL 2146569, * 13 (Md. May 10, 2018) (Watts, J., dissenting), by imposing a second indefinite suspension, the Majority has given Jonathan "yet another bite at the apple with respect to harming the public and further eroding the public's confidence in the legal profession."

For the above reasons, respectfully, I concur in part and dissent in part.

Judge Greene has authorized me to state that he joins in this opinion.